BECKERING, J.
Pursuant to MCR 7.215(J), this Court convened a special conflict panel to resolve the conflict between the previous opinion issued in this case in People v Perkins, 314 Mich App 140; 885 NW2d 900 (2016),[1] and the decision issued in People v Skinner, 312 Mich App 15; 877 NW2d 482 (2015). The issue involves whether a juvenile, whom the prosecution seeks to subject to a sentence of life without parole under MCL 769.25, is entitled under the Sixth Amendment of the United States Constitution to have a jury determine whether life without parole is warranted. As evidenced by the existence of this special conflict panel, we recognize that this is a difficult issue. Also not lost on this *377 panel is the understanding that juveniles who commit a heinous offense, while undoubtedly deserving of punishment, are categorically less culpable than their adult counterparts and are less deserving of the maximum punishment available under the law. As the United States Supreme Court has made unmistakably clear, it is only the truly rare juvenile who will be deserving of the harshest penalty available under the laws of this state, and a life-without-parole sentence is an unconstitutional penalty for all juveniles but those whose crimes reflect irreparable corruption. For this reason, while we conclude that a judge, not a jury, is to make this determination, the sentencing judge must honor the mandate that was made abundantly clear in Miller v Alabama, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and other recent Eighth Amendment caselaw: a sentence of life without parole is to be reserved for only the rarest of juvenile offenders so as to avoid imposing an unconstitutionally disproportionate life-without-parole sentence on a transiently immature offender. This mandate necessarily affects not only the way a trial court is to exercise its discretion when meting out punishment, but also the way an appellate court is to review a life-without-parole sentence for a juvenile offender. In short, youth matters when it comes to sentencing, and to avoid an unconstitutional sentence, our courts, at sentencing and on appeal, must carefully take this into account when going about the exceedingly difficult task of determining whether a juvenile is irreparably corrupt—meaning incapable of rehabilitation for the remainder of his or her life.
I. FACTS
The facts of this case are fully set forth in the prior opinion and do not bear repeating, save for a few *378 pertinent details. Following trial, a jury convicted defendant Kenya Hyatt of first-degree felony murder, MCL 750.316(l)(b), conspiracy to commit armed robbery, MCL 750.529, armed robbery, MCL 750.529, and possession of a firearm during the commission of a felony, MCL 750.227b(l). At a sentencing hearing conducted pursuant to MCL 769.25(6), the trial court sentenced defendant, who was 17 years old at the time of the offenses, to life without the possibility of parole for the first-degree murder conviction. The prior panel reversed his sentence because the trial judge, not a jury, was the sentencer, and because it was bound to follow the decision reached by the majority in Skinner, 312 Mich App 15. Perkins, 314 Mich App at 165-179. Nevertheless, the prior panel in the instant case noted that but for Skinner, it would have affirmed the sentence because it concluded that a judge, not a jury, was to determine a juvenile’s eligibility for a life-without-parole sentence under MCL 769.25. Id. Because it disagreed with Skinner on this point, the prior panel declared a conflict with Skinner, and the Court of Appeals ordered a special conflict panel convened. People v Perkins, unpublished order of the Court of Appeals, entered February 12, 2016 (Docket Nos. 323454, 323876, and 325741).
II. STANDARD OF REVIEW
Resolution of the conflict in this case requires us to construe MCL 769.25 and to examine defendant’s constitutional rights under the Sixth Amendment and the Eighth Amendment of the United States Constitution. We review de novo these issues of law. People v Humphrey, 312 Mich App 309, 314; 877 NW2d 770 (2015) (statutory construction); People v Al-Shara, 311 Mich App 560, 567; 876 NW2d 826 (2015) (constitutional law).
*379 III. ANALYSIS
As was recognized in Skinner and by the prior panel in this case, the instant case involves the confluence of Sixth Amendment and Eighth Amendment jurisprudence. We begin by briefly touching on the pertinent Eighth Amendment caselaw.
A. RECENT EIGHTH AMENDMENT CASELAW
1. MILLER v ALABAMA
In Miller v Alabama, 567 US 460, 479; 132 S Ct 2455; 183 L Ed 2d 407 (2012), the United States Supreme Court considered an Eighth Amendment challenge to mandatory life-without-parole sentences for juvenile offenders in homicide cases and concluded that “[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence [life without parole], such a scheme poses too great a risk of disproportionate punishment.” The Court emphasized that the unique characteristics of youth warranted treating juveniles differently from adults for purposes of sentencing. In particular, drawing on past Eighth Amendment precedent in Roper v Simmons, 543 US 551, 578; 125 S Ct 1183; 161 L Ed 2d 1 (2005) (imposing a categorical ban on capital punishment for all juvenile offenders), and Graham v Florida, 560 US 48, 82; 130 S Ct 2011; 176 L Ed 2d 825 (2010) (banning life-without-parole sentences for juveniles in nonhomicide cases), the Court noted that juveniles have “lesser culpability” and a greater capacity for reform and thus “are constitutionally different from adults for purposes of sentencing.” Miller, 567 US at 470-471. Specifically, the Court explained that Roper and Graham recognize “three significant gaps between juveniles and adults”:
*380 First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable ... to negative influences and outside pressures, including from their family and peers; they have limited contro [1] over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child’s character is not as well formed as an adult’s; his traits are less fixed and his actions less likely to be evidence of irretrievablfe] deprav[ity], [Id. at 471 (citations and quotation marks omitted; alterations in original).]
In addition to noting that the characteristics of youth warranted treating juveniles differently, the Court recognized the severity of a life-without-parole sentence for juveniles. Particularly, the Court took notice of the idea that the majority in Graham “likened life without parole for juveniles to the death penalty itself....” Id. at 470. See also Graham, 560 US at 69-71. The Graham majority did so by noting that life without parole was especially harsh for a juvenile offender, who will “almost inevitably serve ‘more years and a greater percentage of his life in prison than an adult offender.’ ” Miller, 567 US at 475, quoting Graham, 560 US at 70. And given that Roper categorically banned the death penalty for juvenile offenders, life without parole became the “ultimate penalty for juveniles .. ..” Miller, 567 US at 475. Because Graham likened life without parole for juveniles to the death penalty, the Court reasoned that Graham made death-penalty caselaw—which imposed the requirement of individualized sentencing through consideration of the offender’s character and record, along with the circumstances of the offense and other mitigating or aggravating factors—relevant to the issue at hand. Id.
In light of the characteristics of youth and pertinent *381 Eighth Amendment precedent, the Court concluded that mandatory life-without-parole sentencing schemes for juveniles, “by their nature, preclude a sentencer from taking account of an offender’s age and the wealth of characteristics and circumstances attendant to it.” Id. at 476. “And still worse,” continued the Court, “each juvenile (including these two 14-year-olds) will receive the same sentence as the vast majority of adults committing similar homicide offenses—but really, as Graham noted, a greater sentence than those adults will serve.” Id. at 477. Accordingly, the Court barred mandatory life-without-parole sentences for juvenile offenders in homicide cases and provided a number of nonexhaustive factors[2] that a sentencer should consider before imposing a life-without-parole sentence:
Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Id. at 477-478.]
The Court stopped short of considering a categorical ban on life-without-parole sentences for juveniles be *382 cause that issue was not before it but held that the Eighth Amendment forbids the imposition of a mandatory penalty because it “prevent [s] the sentencer from taking account of’ the offender’s youthfulness, diminished culpability, and increased potential for reform. Id. at 476. Yet, while not imposing a categorical ban, the Court was careful to note that because of a juvenile’s “diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.” Id. at 479. “That is especially so,” reasoned the Court, “because of the great difficulty we noted in Roper and Graham of distinguishing at this early age between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.” Id. at 479-480 (citations and quotation marks omitted).
2. MONTGOMERY v LOUISIANA
The first—and perhaps most pressing—issue left in Miller’s wake was the issue of retroactivity. A number of states took aim at this issue, including this Court and the Michigan Supreme Court.[3] The United States Supreme Court resolved this issue in Montgomery v Louisiana, 577 US_; 136 S Ct 718; 193 L Ed 2d 599 (2016), a case of which neither Skinner nor Hyatt had the benefit. The majority ruled-—-in a holding that is *383 not of particular relevance for resolving the issue in the present case—that Miller applied retroactively. Id. at _; 136 S Ct at 736. More relevant to our discussion in the instant case was Montgomery’s admonition— continued from Miller—that “a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect irreparable corruption.” Id. at _; 136 S Ct at 726 (citation and quotation marks omitted). The Court also acknowledged, in the context of concluding that the rule in Miller was substantive and thus subject to retroactive application, that Miller did not forbid states from imposing life-without-parole sentences altogether. Id. at_136 S Ct at 734. However, Miller nevertheless barred life without parole “for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility’; “[f]or that reason, Miller is no less substantive than are Roper and Graham.” Id. at_; 136 S Ct at 734.
Also relevant to our discussion, the Court in Montgomery acknowledged that the holding in Miller, while substantive, nevertheless “has a procedural component” in that it requires “a sentencer to consider a juvenile offender’s youth and attendant characteristics before determining that life without parole is a proportionate sentence.” Id. at __; 136 S Ct at 734. This procedural component—a hearing at which “ ‘youth and its attendant characteristics’ are considered as sentencing factors”—was necessary to give effect to Miller’s “substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity.” Id. at_; 136 S Ct at 735. The Supreme Court, in rejecting an argument made in that case, acknowledged that Miller did not require trial courts to make findings of fact regarding a child’s “incorrigibility.” Id. at_; 136 S Ct at 735. However, *384 “[t]hat Miller did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, Miller established that this punishment is disproportionate under the Eighth Amendment.” Id. at __; 136 S Ct at 735. In the absence of express procedural requirements or fact-finding requirements set forth in Miller, the Court in Montgomery emphasized that it was incumbent on states to develop procedures to enforce Miller’s substantive guarantee of individualized sentencing for juvenile offenders facing the possibility of life without parole. Id. at_; 136 S Ct at 735.
B. MCL 769.25—OUR RESPONSE TO MILLER
In response to Miller’s directive about individualized sentencing, our Legislature enacted 2014 PA 22, which, in relevant part, added MCL 769.25. For certain enumerated homicide offenses, the statute allows the prosecuting attorney to “file a motion under this section to sentence” a juvenile offender “to imprisonment for life without the possibility of parole . . . .” MCL 769.25(2). With a nod toward Miller, the statute provides that:
(6) If the prosecuting attorney files a motion under subsection (2), the court shall conduct a hearing on the motion as part of the sentencing process. At the hearing, the trial court shall consider the factors listed in Miller v Alabama. [567] US [460]; 183 L Ed 2d 407; 132 S Ct 2455 (2012), and may consider any other criteria relevant to its decision, including the individual’s record while incarcerated.
(7) At the hearing under subsection (6), the court shall specify on the record the aggravating and mitigating circumstances considered by the court and the court’s reasons supporting the sentence imposed. The court may *385 consider evidence presented at trial together with any evidence presented at the sentencing hearing. [MCL 769.25.]
However, absent a motion by the prosecuting attorney seeking the penalty of life without parole, MCL 769.25(4), or “[i]f the court decides not to sentence the individual to imprisonment for life without parole eligibility, the court shall sentence the individual to a term of imprisonment for which the maximum term shall be not less than 60 years and the minimum term shall be not less than 25 years or more than 40 years,” MCL 769.25(9).
C. APPRENDI AND SIXTH AMENDMENT JURISPRUDENCE
1. APPRENDI
The issue at the heart of this conflict case is whether Miller—and how our Legislature has chosen to implement Miller’s guarantee of individualized sentencing in MCL 769.25—runs afoul of Sixth Amendment case-law concerning a defendant’s right to have a jury decide those facts that increase the maximum available punishment. Neither Miller nor Montgomery had occasion to address this issue. In People v Carp, 496 Mich 440, 490-491, 491 n 20; 852 NW2d 801 (2014)—a pre-Montgomery case dealing with the retroactivity of Miller—our Supreme Court declined to address the issue.[4] Accordingly, we must turn our attention to pertinent Sixth Amendment caselaw.
In one of the more influential cases in this line of precedent, Apprendi v New Jersey, 530 US 466, 490; 120 S Ct 2348; 147 L Ed 2d 435 (2000), the United States Supreme Court held that “[o]ther than the fact *386 of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.” In Apprendi, the defendant pleaded guilty to a weapons offense for which the prescribed penalty range was 5 to 10 years’ imprisonment. Id. at 469-470. Subsequent to the trial court accepting the plea, the prosecutor filed a motion to extend the term of imprisonment based on a “hate crime” statute. Id. at 470. The trial court found that the defendant acted “with a purpose to intimidate” under the statute, which allowed the court to enhance the defendant’s maximum sentence to 10-20 years’ imprisonment. Id. at 471.
The Supreme Court agreed with the defendant’s challenge to his sentence in Apprendi, concluding that the due-process guarantee of the Fourteenth Amendment as well as the Sixth Amendment right to a jury trial “indisputably entitle a criminal defendant to a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.” Id. at 477 (citation and quotation marks omitted; alteration in original). Any fact, other than a prior conviction, “that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt.” Id. at 490.
While the Apprendi Court held that elements of the offense must be submitted to the jury, it was careful to specify that the holding in that case did not suggest
that it is impermissible for judges to exercise discretion— taking into consideration various factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute. We have often noted that judges in this country have long exercised discretion of *387 this nature in imposing sentence within statutory limits in the individual case. [Id. at 481.]
Provided that a sentencing judge operated within the limits of punishment as provided by statute and did not increase the maximum punishment, the judge properly exercised his or her sentencing authority. See id. at 482-483. In such an instance, any facts found functioned as mere sentencing factors, rather than elements of an aggravated offense. See id. at 482-483, 485-486. See also 6 LaFave et al, Criminal Procedure (4th ed), § 26.4(h), p 1007.
The Apprendi Court also took care to note the historical distinction in its jurisprudence “between facts in aggravation of punishment and facts in mitigation.” Apprendi, 530 US at 490 n 16. The former requires a jury to find the fact proved beyond a reasonable doubt, while the latter does not. Id. As to mitigating factors, the Court explained:
If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute. If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone. Core concerns animating the jury and burden-of-proof requirements are thus absent from such a scheme. [Id.]
2. EXPANSION OP APPRENDI
In the years since it issued Apprendi, the Supreme Court has expanded the territorial limits oí “Apprendi- *388 land”—a term coined by Justice Scalia[5]—to include, among other matters, judicial fact-finding on the aggravating factors required for imposition of the death penalty, Ring v Arizona, 536 US 584, 609; 122 S Ct 2428; 153 L Ed 2d 556 (2002), judicial fact-finding that affected sentencing-guideline-range máximums, see United States v Booker, 543 US 220, 226-227, 244; 125 S Ct 738; 160 L Ed 2d 621 (2005); Blakely v Washington, 542 US 296, 305, 313; 124 S Ct 2531; 159 L Ed 2d 403 (2004), determinate sentencing tiers under which the trial judge, not the jury, was given authority to find facts that exposed a defendant to an elevated sentence, see Cunningham v California, 549 US 270, 274-275, 293; 127 S Ct 856; 166 L Ed 2d 856 (2007), mandatory minimum sentences, see Alleyne v United States, 570 US_; 133 S Ct 2151, 2155, 2163-2164; 186 L Ed 2d 314 (2013),[6] and criminal fines, Southern Union Co v United States, 567 US 343, 346; 132 S Ct 2344; 183 L Ed 2d 318 (2012). In each of these cases, the Court reiterated that any fact, other than a prior conviction, that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. See, e.g., Blakely, 542 US at 301. For purposes of Apprendi, this statutory maximum “is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings.” Id. at 303-304. It does not matter for purposes of Apprendi whether the enhancement of the maximum sentence occurs on the basis of the finding of *389 a single, specified fact, several specified facts, or on any aggravating fact: the Sixth Amendment violation is the same regardless. Id. at 305. Hence, if a statute provides for a particular term of imprisonment as well as an enhanced term, a judge cannot, when the jury’s verdict only authorized the lower term, find facts that increase the maximum punishment. Cunningham, 549 US at 288. A defendant has the right to have a “jury find the existence of any particular fact that the law makes essential to his punishment.” Booker, 543 US at 232 (citation and quotation marks omitted). The Court has repeatedly stressed that a “judge’s authority to sentence derives wholly from the jury’s verdict. Without that restriction, the jury would not exercise the control that the Framers intended.” Blakely, 542 US at 306.
The Supreme Court’s Sixth Amendment jurisprudence has emphasized that the Apprendi rule was not concerned with the label—element or sentencing factor—assigned to a particular factual finding. Rather, it was the effect of the particular finding that mattered. That is, did the fact or facts found by the sentencing judge increase the statutory maximum sentence from that which was authorized by the jury’s verdict? Booker, 543 US at 231; Blakely, 542 US at 306; Apprendi, 530 US at 494. See also Alleyne, 570 US at _; 133 S Ct at 2158 (“The touchstone for determining whether a fact must be found by a jury beyond a reasonable doubt is whether the fact constitutes an ‘element’ or ‘ingredient’ of the charged offense.... [A] fact is by definition an element of the offense and must be submitted to the jury if it increases the punishment above what is otherwise legally prescribed.”); Cunningham, 549 US at 290 (“If the jury’s verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the *390 Sixth Amendment requirement is not satisfied.”). A particular fact functions as an “element” if, by law, it increases the penalty for that crime. Alleyne, 570 US at _; 133 S Ct at 2155.
3. HURST AND RING
In addition to these extensions oí Apprendi, we note an area of caselaw to which the parties pay particular attention in the instant case: the extension of the Apprendi rule to cases involving aggravating factors used to enhance a sentence for purposes of imposing the death penalty. See Hurst v Florida, 577 US_; 136 S Ct 616; 193 L Ed 2d 504 (2016); Ring, 536 US 584. Although these cases dealt with the imposition of the death penalty on adult offenders, the sentencing schemes—and the intersection of Eighth Amendment considerations and Sixth Amendment jury entitlements at issue in both Hurst and Ring—provide useful analysis for addressing the sentencing scheme at issue in the instant case.
In Ring, 536 US at 589, 591, the jury convicted the defendant, Timothy Ring, of felony murder for the death of the victim during the robbery of an armored car, but deadlocked on the charge of premeditated murder. The issue in that case concerned whether the jury’s verdict authorized the imposition of the death penalty under Arizona law. “Under Arizona law, [the defendant] could not be sentenced to death, the statutory maximum penalty for first-degree murder, unless further findings were made.” Id. at 592 (emphasis added). In particular, Arizona’s first-degree murder statute authorized the penalty of death or life imprisonment, but, for purposes of determining which penalty to impose, Arizona law directed the trial judge to “conduct a separate sentencing hearing to determine *391 the existence or nonexistence of [certain enumerated] circumstances . . . Id. (citation and quotation marks omitted; alteration in original). The sentencing scheme at issue provided that the trial judge was to determine whether any of the enumerated aggravating factors existed, as well as any mitigating circumstances, and that the judge could only impose the death penalty “if there is at least one aggravating circumstance and there are no mitigating circumstances sufficiently substantial to call for leniency.” Id. at 593 (citation and quotation marks omitted).
The defendant in Ring contended that the Sixth Amendment required jury findings on the statutory aggravating factors. Id. at 597 n 4. The aggravating factors required by Arizona law were added by the state’s legislature in large part due to Eighth Amendment caselaw concerning the imposition of death sentences and the requirement of aggravating factors. Id. at 606, citing Maynard v Cartwright, 486 US 356, 362; 108 S Ct 1853; 100 L Ed 2d 372 (1988); Furman v Georgia, 408 US 238; 92 S Ct 2726; 33 L Ed 2d 346 (1972). The Supreme Court in Ring remarked that the addition of aggravating factors was an “element” that was “constitutionally required” by the Eighth Amendment. Ring, 536 US at 606-607.
The Supreme Court found that Arizona’s sentencing scheme could not be reconciled with Apprendi because, “[b]ased solely on the jury’s verdict finding [the defendant] guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment,” not death. Id. at 597. See also id. at 609 (holding that the Arizona sentencing scheme violated the Sixth Amendment because it “allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the *392 death penalty”). “This was so because, in Arizona, a death sentence may not legally be imposed” under state law “unless at least one aggravating factor is found to exist beyond a reasonable doubt.” Id. at 597 (citation and quotation marks omitted; emphasis added). ReviewingApprendi, the Court stated that the “dispositive question” was “ ‘one not of form, but of effect/ If a State makes an increase in a defendant’s authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it— must be found by a jury beyond a reasonable doubt.” Id. at 602, quoting Apprendi, 530 US at 494. In Ring, the “effect” of the statutory scheme required the finding of an aggravating fact before a defendant could be exposed to a greater punishment—death—than was authorized by the jury’s verdict alone. Ring, 536 US at 604. “Because Arizona’s enumerated aggravating factors operate as the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury.” Id. at 609 (citation and quotation marks omitted).
In Hurst, another case dealing with the imposition of the death penalty, the Court dealt with a variation on the issue raised in Ring. In that case, the defendant, Timothy Hurst, was convicted of first-degree murder. Hurst, 577 US at _; 136 S Ct at 619-620. Under Florida law, the maximum sentence that could be imposed for the offense was life imprisonment. Id. at_; 136 S Ct at 620. An offender could only receive a death sentence if the trial court made additional findings of fact. Id. at_; 136 S Ct at 620. The Florida sentencing proceeding was a hybrid proceeding in which following an evidentiary hearing, the jury would first render an “advisory verdict” of life or death without specifying the factual basis for its recommendation. Id. at_; 136 S Ct 620. Afterward, the trial judge would weigh the aggra *393 vating and mitigating factors and then decide between a sentence of life imprisonment or death, regardless of the jury’s recommendation. Id. at _; 136 S Ct at 620. Further, “[i]f the court imposes death, it must set forth in writing its findings upon which the sentence of death is based.” Id. at _; 136 S Ct at 620 (citation and quotation marks omitted).
The United States Supreme Court concluded that Florida’s sentencing scheme could not be reconciled with Ring and Apprendi. Id. at_; 136 S Ct at 621. The Court recited its holding in Ring that “Arizona’s capital sentencing scheme violated Apprendis rule because the State allowed a judge to find the facts necessary to sentence a defendant to death.” Id. at_; 136 S Ct at 621, citing Ring, 536 US at 591. This same analysis, the Court concluded, applied in Hurst and demonstrated the constitutional infirmity of the defendant’s death sentence in that case. Hurst, 577 US at_; 136 S Ct at 621-622. “Like Arizona at the time of Ring, Florida does not require the jury to make the critical findings necessary to impose the death penalty. Rather, Florida requires a judge to find these facts.” Id. at ; 136 S Ct at 622 (emphasis added). That Florida’s sentencing scheme included an advisory jury verdict—a component not present in Arizona’s scheme—did not change the analysis because the advisory jury did not make specific factual findings and its recommendation was not binding on the judge. Id. at_; 136 S Ct at 622. The Court concluded:
As with Timothy Ring, the maximum punishment Timothy Hurst could have received without any judge-made findings was life in prison without parole. As with Ring, a judge increased Hurst’s authorized punishment based on her own factfinding. In light of Ring, we hold that Hurst’s sentence violates the Sixth Amendment. [Id. at _; 136 S Ct at 622.]
*394 In short, the Sixth Amendment violation in Hurst, as in Ring, was that—although the statutory maximum for the homicide offense of which the defendant was convicted authorized the death penalty—a judge could only impose the death penalty on the basis of findings beyond the jury’s verdict. The death penalty was not available but for judicial fact-findings regarding certain aggravating factors that had not been submitted to a jury for determination beyond a reasonable doubt.
4. APPRENDI DOES NOT BAR ALL JUDICIAL FACT-FINDING
For all that was said in Apprendi and its progeny, we note that the Supreme Court’s holding in those cases must not be read as a prohibition against all judicial fact-finding at sentencing. Indeed, the rules from Ap-prendi and its progeny do not stand for the proposition that a sentencing scheme in which judges are permitted “genuinely to exercise broad discretion.. . within a statutory range” is unconstitutional; rather, as articulated in Cunningham, “everyone agrees” that such a scheme “encounters no Sixth Amendment shoal.” Cunningham, 549 US at 294 (citation and quotation marks omitted; alteration in original; emphasis added). See also Alleyne, 570 US at _; 133 S Ct at 2163 (“Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment.”). Therefore, a judge acting within the range of punishment authorized by statute may exercise his or her discretion—and find facts and consider factors relating to the offense and the offender—without violating the Sixth Amendment. Id. at_; 136 S Ct at 2163, citing Apprendi, 530 US at 481. As explained in Alleyne, 570 US at _; 133 S Ct at 2163:
*395 [W]ithin the limits of any discretion as to the punishment which the law may have allowed, the judge, when he pronounces sentence, may suffer his discretion to be influenced by matter shown in aggravation or mitigation, not covered by the allegations of the indictment. [1 J. Bishop, Criminal Procedure 50 (2d ed, 1872),] § 85, at 54.
[Establishing what punishment is available by law and setting a specific punishment within the bounds that the law has prescribed are two different things. Apprendi, [530 US] at 519, 120 S Ct 2348 (Thomas, J., concurring). [Quotation marks omitted; first and third alteration in original.]
D. SKINNER AND HYATT
With that backdrop in mind, we arrive at the basis for this conflict: Skinner and the prior opinion in this case.
1. SKINNER
This Court first encountered the issue in Skinner, 312 Mich App 15. In that case, the majority, after a careful and detailed discussion of the relevant caselaw, arrived at the conclusion that a defendant is entitled to have a jury be the decision-maker at the so-called Miller hearing required by MCL 769.25. The majority concluded that MCL 769.25 mandated “findings” and that those findings constituted elements of the offense. Skinner, 312 Mich App at 42-43. The majority reasoned that MCL 769.25 established a “default” sentence of a term of years for juveniles convicted of first-degree murder because, absent a motion by the prosecution, the trial court was required to impose a term-of-years sentence. Id. at 43-44, citing MCL 769.25(4). This conclusion as to a “default” sentence was premised, in *396 part, on our Supreme Court’s opinion in Carp, which used the same term, “default,” and concluded that “MCL 769.25 now establishes a default sentencing range for individuals who commit first-degree murder before turning 18 years of age.” Skinner, 312 Mich App at 44, quoting Carp, 496 Mich at 458. According to the majority in Skinner, MCL 769.25 conditioned a life-without-parole sentence for a juvenile offender on two things: (1) the filing of a motion by the prosecuting attorney to impose the sentence and (2) the trial court’s findings on the Miller factors and on any other criteria relevant to its decision. Skinner, 312 Mich App at 45, citing and quoting MCL 769.25(6). This scheme, according to the majority, authorized an enhanced sentence on the basis of factual findings by the trial court and ran afoul of the rule established in Apprendi and its progeny. Skinner, 312 Mich App at 45.
Clearly, the findings mandated by MCL 769.25(6) “expose the defendant to a greater punishment than that authorized by the jury’s guilty verdict,” Apprendi, 530 US at 494, and therefore act as the “functional equivalent” of elements of a greater offense that must be proved to a jury beyond a reasonable doubt, Ring, 536 US at 609. An enhanced punishment under MCL 769.25 is not based merely on defendant’s prior convictions, on facts admitted by defendant, or on facts that are part and parcel of the elements that were submitted to the jury during the guilt phase of the proceeding. Rather, like in Apprendi, 530 US at 476, in this case the state threatened defendant with certain pains—i.e., a term-of-years sentence—following her jury conviction of first-degree murder and with additional pains—i.e., life without parole—following additional findings by the trial court. “Merely using the label ‘sentence enhancement’ to describe the latter surely does not provide a principled basis for treating them differently.” Id. The effect of MCL 769.25 plainly subjects defendant to harsher punishment on the basis of judicially *397 found facts in contravention of the Sixth Amendment. [Skinner, 312 Mich App at 46.]
In a strong dissent, Judge SAWYER rejected the idea that MCL 769.25 required findings of fact that increased the maximum sentence authorized by statute. Skinner, 312 Mich App at 63-64 (SAWYER, J., dissenting). Judge SAWYER equated the requirements of MCL 769.25 to sentencing factors, rather than fact-finding that authorized the trial court to impose a greater sentence than the statutory maximum. Id. “[T]he juvenile lifer law does not require any particular judicial fact-finding to increase the potential sentence from a term of years to life without parole.” Id. at 70. MCL 769.25(6), as summarized by Judge SAWYER,
does require the trial court to conduct a hearing before it may impose a sentence of life without parole on a juvenile offender. And it further requires that the trial court “consider” the factors listed in Miller, as well as any other criteria the trial court deems relevant to its decision. MCL 769.25(7) then requires that “the court shall specify on the record the aggravating and mitigating circumstances considered by the court and the court’s reasons supporting the sentence imposed.” But nowhere does the statute require the trial court to make any particular finding of fact before it is authorized to impose a sentence of life without parole. Rather, after conducting the hearing and considering the evidence presented at the hearing as well as the evidence presented at trial, the trial court makes its decision and must state on the record the reasons for that decision. As our Supreme Court noted in Carp, this process allows for the “individualized sentencing” procedures established by Miller. This procedure also presumably allows for more meaningful appellate review of the sentence. [Skinner, 312 Mich App at 73 (SAWYER, J., dissenting) (citation omitted; emphasis added).]
Likewise, Judge SAWYER concluded that Miller itself did not require any particular fact to be found before a *398 court could impose a sentence of life without parole. Id. at 74. Rather, it established a framework for ensuring that juveniles would receive an individualized sentence. Id.

2. HYATT

In the prior appeal in the instant matter, defendant Hyatt argued that he was entitled to have a jury determine his sentence in accordance with Skinner. The panel recognized that it was bound by Skinner, but stated, “[W]e believe that Skinner was wrongly decided.” Perkins, 314 Mich App at 165. Like the panel in Skinner, the prior panel engaged in a lengthy and detailed analysis of MCL 769.25, Miller, and Sixth Amendment caselaw such as Apprendi, Ring, Booker, Blakely, Cunningham, and Alleyne. Id. at 165-176. After this detailed analysis, the panel agreed with Judge Sawyer’s dissent in Skinner. That is, the prior panel believed that MCL 769.25 “does not run afoul of [Sixth Amendment jurisprudence] because Hyatt did not receive an enhanced sentence. The sentencing court did not determine facts not already determined by the jury’s verdict.” Id. at 176. Moreover, unlike in Apprendi, Ring, Blakely, Cunningham, and Alleyne, “nothing in MCL 769.25 premised a sentencing court’s authority to impose a term of life imprisonment without parole on any specific finding that Hyatt’s jury failed to consider in convicting Hyatt of first-degree felony murder. Because the prosecutor undisputedly and properly filed a motion seeking a life-without-parole sentence for Hyatt, the mandates in §§ 25(4) and (9) regarding the term of years did not apply.” Id. at 177-178. Finally, the panel reasoned, “[T]he plain language of the statute did not require the trial court to make any findings concerning aggravating or miti *399 gating factors before the court could sentence Hyatt to life without parole. Consequently, the life-without-parole sentence in this case came within the statutory maximum . . . Id. at 178.
The prior panel remanded the matter for resentenc-ing, but stated that, “[w]ere it not for Skinner, we would affirm the sentencing court’s decision to sentence Hyatt to life imprisonment without the possibility of parole.” Id. at 179.
E. RESOLUTION OP THE CONFLICT
We hold that the prior panel’s analysis in this case was correct. Neither Miller nor MCL 769.25 implicates the right to a jury trial under Apprendi and its progeny. Rather, by implementing Miller’s Eighth Amendment protections through its enactment of MCL 769.25, the Legislature simply established a procedural framework for protecting a juvenile’s Eighth Amendment rights at sentencing. The sentencing procedure at issue in this case does not involve the concern that was at issue in Apprendi, 530 US at 490—fact-finding that increases the maximum penalty for juvenile homicide offenders. In other words, the instant case is not one in which the finding of a particular fact increases the maximum penalty. Nor does the instant case involve a statutory scheme that makes the imposition of life without parole contingent on any particular finding. Under MCL 769.25, the statutory maximum for juvenile offenders—assuming the requisite motion has been filed—is a life-without-parole sentence, and when imposing that rare sentence, the sentencing authority is not tasked with finding any particular fact before making its decision. A careful examination of both Miller and MCL 769.25 compels this result.
*400 At the outset, we reject arguments that the Supreme Court’s decision in Miller can be read to implicate the Sixth Amendment; we also reject the idea that the decision in Miller suggests the right to have a jury determination on the sentence of life without parole. In this respect, it is important to note the Court’s concern in Miller: the imposition of a disproportionate sentence on juvenile offenders. The risk of a disproportionate sentence was, for purposes of the Eighth Amendment, unacceptable under a system of mandatory life-without-parole sentences for certain homicide offenses. Miller, 567 US at 479 (“By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment.”). To alleviate this concern, the Court created a framework for protecting a juvenile’s Eighth Amendment right against disproportionate punishment. Important to our present case, this framework does not make the imposition of a life-without-parole sentence contingent upon the finding of a certain fact. The Court’s decision in Miller did not require a sentencing authority to consider an offender’s youth before aggravating the available penalty. Rather, the Court imposed an individualized sentencing mandate for juvenile offenders convicted of homicide offenses. Individualized sentencing was required to ensure proportionality, not to aggravate the maximum penalty available under the law. Hence, a sentencing authority remains free under Miller to impose a life-without-parole sentence based solely on the jury’s verdict. Miller simply holds that a framework of protections required by the Eighth Amendment must be implemented to ensure that the imposition of the maximum available penalty—life without parole—is proportionate to the particular offender and the particular of *401 fense. In short, the remodeling that Miller performed on life-without-parole sentences for juveniles did not touch the ceiling—or floor, for that matter—of the available sentence for juvenile homicide offenders.
In support of our interpretation of Miller’s demands, we note the Supreme Court’s discussion of Miller in Montgomery.[7] Notably, in Montgomery, 577 US at __; 136 S Ct at 735, albeit not within the context of a Sixth Amendment discussion, the Supreme Court expressly recognized that its decision in Miller did not require a sentencing authority to make a finding of fact on a child’s incorrigibility before imposing a life-without-parole sentence. As stated in Montgomery, “[t]hat Miller did not impose a formal factfinding requirement [regarding incorrigibility] does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, Miller established that this punishment is disproportionate under the Eighth Amendment.” Id. at _; 136 S Ct at 735. In accordance with Montgomery’s conclusion about Miller’s demands, we decline to conclude that Miller implicates a defendant’s Sixth Amendment right to a jury trial.[8]
*402 This is not to say that the sentencing procedure envisioned by Miller does not involve any fact-finding.[9] However, the procedure described by Miller is missing key components for purposes of Apprendi and its progeny: nowhere in Miller’s individualized sentencing mandate is the idea that Miller altered the maximum punishment available for juvenile offenders or made the imposition of any punishment contingent on fact-finding. In other words, the Court did not hold that a life-without-parole sentence was unavailable unless the sentencing authority found certain facts. In this sense, Miller did not impose any aggravating factors such as those that were at issue in Ring, 536 US at 591-592; in that case, Arizona law provided that a jury’s verdict alone was insufficient to authorize capital punishment and a death sentence required additional findings on certain aggravating factors. In contrast, Miller merely provided certain considerations that must be taken into account by a sentencing authority when imposing the maximum sentence—life without parole—in order to protect a juvenile’s Eighth Amendment right against a disproportionate, nonindi-vidualized sentence. Miller, 567 US at 477, 480-481.
*403 Hence, Miller does not implicate the type of fact-finding prohibited by Apprendi. The process described in Miller was merely a means of ensuring that the maximum sentence available under the law—life without parole—was proportionate to the particular juvenile offender at issue. The considerations required by Miller’s individualized sentencing guarantee are sentencing factors, not elements that must be found before a more severe punishment is authorized. See Apprendi, 530 US at 482-483, 485-486. As succinctly stated in Alleyne, 570 US at __; 133 S Ct at 2163, Sixth Amendment jurisprudence has “recognized that broad sentencing discretion, informed by judicial fact-finding, does not violate the Sixth Amendment.”[10]
However, the conclusion that Miller does not require certain factual findings in order to impose a sentence of life without parole on a juvenile offender is not, by itself, dispositive of the issue raised. As the Supreme Court in Montgomery acknowledged, the implementation of Miller’s directives was a matter left largely to the states. Montgomery, 577 US at _; 136 US at 735. We now turn to the legislative response at issue in this case, MCL 769.25, to determine if the right to a jury determination can be found therein.
Careful examination of MCL 769.25 reveals that our Legislature did not alter the statutory maximum sen *404 tence that may be imposed solely on the basis of the jury’s verdict, nor did our Legislature make imposition of the statutory maximum dependent on any particular finding of fact. The statute provides that in order to sentence a juvenile defendant to life without parole, the prosecuting attorney must, in a case involving an enumerated homicide offense, file a motion seeking that sentence within the specified period. MCL 769.25(2) and (3). If the prosecuting attorney files this motion, the trial court “shall conduct a hearing on the motion as part of the sentencing process.” MCL 769.25(6). At the hearing, the trial court is to consider “the factors listed in Miller v Alabama . . . and may consider any other criteria relevant to its decision, including the individual’s record while incarcerated.” MCL 769.25(6). Then, in what would appear to be an effort to aid appellate review of the sentence, the trial court “shall specify on the record the aggravating and mitigating circumstances considered by the court and the court’s reasons supporting the sentence imposed. The court may consider evidence presented at trial together with any evidence presented at the sentencing hearing.” MCL 769.25(7).
In sum, MCL 769.25 does two important things. As an initial matter, the statute plainly states that the statutory maximum for the enumerated homicide offenses—in the event the prosecution files the requisite motion—is life without parole. Any contention that MCL 769.25 creates a “default”[11] sentence of a term of years in all instances ignores the plain language of the *405 statute. MCL 769.25(2) plainly permits the prosecuting attorney to seek life without parole upon the filing of the requisite motion. Once this motion is filed, the statutory maximum is life without parole, and the trial court has discretion to sentence up to that statutory maximum.
This leads to our second point. MCL 769.25 does not make the imposition of this statutory maximum contingent on any particular fact. Rather, the statute mirrors the requirement of Miller—individualized sentencing. That is, MCL 769.25 does away with mandatory life-without-parole sentences and requires the trial court, when the maximum sentence is sought, to make the individualized sentencing determination required by Miller. If, consistently with Miller’s demands, the sentencing judge deems life without parole to be appropriate—meaning that the case before it is one of the rare cases described by Miller—the trial court is authorized by the jury’s verdict to impose a life-without-parole sentence. Indeed, as is the case with Miller, our statutory scheme does not require any additional findings before the imposition of a life-without-parole sentence. The sentencing judge decides whether to exercise his or her discretion to impose that statutory maximum by considering the so-called Miller factors to satisfy Miller’s individualized sentencing mandate. In sum, when the prosecuting attorney files the requisite motion, the “ ‘statutory maximum’ for Apprendi purposes,” see Blakely, 542 US at 303, is life without parole. This sentence, then, is permitted “solely on the basis of the facts reflected in the jury verdict. . . .” Id. This type of sentencing scheme does not run afoul of Apprendi and its progeny.
In this sense, the sentencing scheme imposed by MCL 769.25 is different from the schemes at issue in *406 Apprendi, Blakely, Booker, and Cunningham—and that difference is of critical importance for purposes of the Sixth Amendment inquiry. In particular, we note that in Apprendi, 530 US at 470, an enhanced sentence was possible if the prosecution filed a motion seeking such a sentence and after a hearing the trial judge found that the defendant acted with a biased purpose—which was a fact not encompassed by the jury’s verdict. In this case, by contrast, MCL 769.25 allows the prosecuting attorney to file a motion to sentence up to the maximum that is allowed by the jury’s verdict. The prosecuting attorney’s motion in the instant case is not meant to trigger a factual finding that will increase the maximum sentence; instead, the motion is filed to initiate the Eighth Amendment protections demanded by Miller.
It is argued that a sentencing judge will necessarily engage in fact-finding during the Miller analysis. On this point, we agree. However, as noted, it is not dispositive that a sentencing judge makes factual findings. The dispositive question is whether the statute authorizes increased punishment, contingent on certain factual findings. Ring, 536 US at 602. Indeed, “[a] statutory requirement that a judge make findings . . . does not mean that any specific finding is necessary for imposition of the sentence.” State v Fell, 210 Ariz 554, 559; 115 P3d 594 (2005).[12] MCL 769.25 does not authorize increased punishment, much less make such an increase contingent on any facts. Instead, the fact-finding that will inevitably occur during the Miller analysis is the kind that “everyone agrees encounters no Sixth Amendment shoal.” Cunningham, 549 US at *407 294 (citation and quotation marks omitted). See also Alleyne, 570 US at _; 133 S Ct at 2163 (“Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment.”). Any fact-finding that occurs “do[es] not pertain to whether the defendant has a legal right to a lesser sentence—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.” Blakely, 542 US at 309.
For comparison purposes, we examine the sentencing of criminal defendants by federal district courts and note the type of judicial fact-finding that occurs under the sentencing factors listed in 18 USC 3553(a).[13] Any fact-finding that occurs with regard to the statutory factors is meant “to inform individual sentencing decisions and to help meet the Sentencing Commission’s twin-goals of sentencing—uniformity *408 and proportionality,” and does not affect the maximum sentence that may be imposed. United States v Ali, 508 F3d 136, 146 n 15 (CA 3, 2007) (citation and quotation marks omitted). Like the federal sentencing guidelines post -Booker, there is no mandatory or default sentence under MCL 769.25 that must be imposed unless the sentencing judge finds facts that the jury never found nor were admitted by the defendant. As noted by the United States Supreme Court in Rita v United States, 551 US 338, 352; 127 S Ct 2456; 168 L Ed 2d 203 (2007), “[t]his Court’s Sixth Amendment cases do not automatically forbid a sentencing court to take account of factual matters not determined by a jury and to increase the sentence in consequence.” Rather, “[t]he Sixth Amendment question” concerns “whether the law forbids a judge to increase a defendant’s sentence unless the judge finds facts that the jury did not find (and the offender did not concede).” Id.
We also reject any argument that MCL 769.25 is comparable to the sentencing scheme that was at issue in Ring, 536 US 584, a case cited frequently by the parties. In Ring, the statutory scheme provided that the maximum penalty was death or life imprisonment, but it conditioned imposition of the death penalty, which represented an increase in the authorized punishment, on further factual findings by the trial judge during a separate sentencing hearing. Id. at 592. Those additional findings concerned aggravating and mitigating circumstances. Id. at 592-593. In the instant case, it is true that MCL 769.25(7) uses the term “aggravating and mitigating circumstances.” The key difference, once again, is that MCL 769.25 does not make the imposition of life without parole contingent upon certain findings. MCL 769.25 only requires that which Miller requires—individualized sentencing based on the so-called Miller factors. The juvenile *409 defendant is—based solely on the jury’s verdict and the prosecuting attorney’s motion-—eligible for a life-without-parole sentence, the statutory maximum.
In sum, all that is mandated by MCL 769.25 is the individualized sentencing required, as stated in Miller, by the Eighth Amendment. The analysis involving the Miller factors does not aggravate punishment; instead, the analysis acts as a means of mitigating punishment because it acts to caution the sentencing judge against imposing the maximum punishment authorized by the jury’s verdict, a sentence which Montgomery cautioned is disproportionate for “the vast majority of juvenile offenders . . . .” Montgomery, 577 US at _; 136 S Ct at 736. In fact, unless the defendant is the rare juvenile deserving of the harshest penalty, the Miller analysis, as incorporated by MCL 769.25, will have the effect of mitigating the available punishment.
The idea that Miller—and MCL 769.25 by its incorporation of the “Miller factors”—sets forth a framework of mitigation, rather than aggravation, is apparent from the text of the Miller decision itself. See Miller, 567 US at 489 (“[O]ur individualized sentencing decisions make clear that a judge or jury[14] must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles.”) (emphasis added). Indeed, the Supreme Court’s decision in Miller is rife with arguments concerning why juveniles are consti *410 tutionally different from adults and why these differences diminish the culpability of juveniles. See, e.g., id. at 471 (explaining that juveniles are “constitutionally different from adults for purposes of sentencing” because, among other reasons, they have “diminished culpability”). The problem with a mandatory life-without-parole sentence, according to Miller, was that it failed to give the sentencing authority “the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles” and that such a mandatory sentencing scheme violated the principle of proportionality by forcing the sentencing authority to ignore “age and age-related characteristics,” i.e., those characteristics that diminish the culpability of the juvenile, thereby warranting a lesser sentence. Id. at 489. The Court in Miller specifically invoked the “mitigating qualities of youth” in explaining why individualized sentencing was necessary when deciding whether to impose the harshest possible penalty available for juveniles—life without parole. Id. at 476 (citation and quotation marks omitted). This culminated in the Court announcing the so-called Miller factors, all of which speak to mitigation and why “chronological age and its hallmark features” should be considered when sentencing a juvenile. Id. at 477. Put simply, Miller required individualized sentencing as a means of mitigating the maximum penalty authorized by the jury’s verdict, rather than aggravating the penalty beyond that which was set forth by law.[15] So, too, MCL 769.25 sets a maximum punishment—in the event the *411 prosecution files the requisite motion—at life without parole and mandates that the sentencing judge consider the Miller factors in a way that mitigates, rather than enhances, the maximum available penalty.
Viewing the Miller factors as a means of mitigation is not to suggest, however, that life without parole remains the default sentence for juveniles convicted of first-degree murder after Miller. Indeed, it is doubtful whether that result could be squared with Miller’s conclusions about the constitutional infirmities inherent in a mandatory life-without-parole sentencing scheme for juveniles. Instead, the Miller factors act as a means of mitigation in the sense that they must be considered by the sentencing judge when he or she is determining whether life without parole is an appropriate sentence to impose.
Our decision today comports with those of numerous state and lower federal courts that have considered, albeit in slightly different contexts, the intersection of the Eighth Amendment’s proportionality requirements and the Sixth Amendment right to a jury trial. The cases from which we draw support stemmed from the United States Supreme Court’s decisions in Atkins v Virginia, 536 US 304, 321; 122 S Ct 2242; 153 L Ed 2d 335 (2002)—concluding that the Eighth Amendment barred the imposition of capital punishment on defendants who are intellectually disabled, and Tison v Arizona, 481 US 137, 158; 107 S Ct 1676; 95 L Ed 2d 127 (1987)—banning the imposition of the death penalty in felony-murder cases unless the defendant: (1) was a major participant in the offense or (2) acted with at least a reckless indifference to human life. The consensus in these cases is that when the Eighth Amendment’s proportionality requirement has barred *412 imposition of the death penalty because of a certain factor or factors that suggested diminished culpability, the determination of whether those certain factors exist is not one that is subject to a jury determination. Stated differently, the Eighth Amendment prohibitions are considered to be mitigating factors that act as a bar against imposing the statutory maximum penalty, rather than as elements that enhance the maximum possible penalty, and the determination of whether those mitigating factors exist need not, under Ap-prendi and its progeny, be made by a jury. See, e.g., State v Agee, 358 Or 325, 364; 364 P3d 971 (2015) (holding that a determination on intellectual disability is a mitigating factor that can be made by a judge and does not, under Apprendi and Ring, require a jury determination); State v Hill, 2008 Ohio 3509, ¶ 68; 177 Ohio App 3d 171, 187; 894 NE2d 108 (Ohio App, 2008) (rejecting the idea that the Eighth Amendment’s prohibition against imposing the death penalty on an intellectually disabled adult required a jury determination of intellectual disability because that determination mitigated, rather than enhanced, the available punishment); Commonwealth v Bracey, 604 Pa 459, 473-474; 986 A2d 128 (2009) (finding that there was no right to a jury trial on an Atkins claim under Ring)-, State v Galindo, 278 Neb 599, 655; 774 NW2d 190 (2009) (rejecting the idea that Tison findings were “elements” of the offense even when the death penalty was imposed); State v Nichols, 219 Ariz 170, 172; 195 P3d 207 (2008) (recognizing that the Sixth Amendment does not require a jury to make Tison findings, but a state statutory scheme could require as much if the legislature so chose); State v Johnson, 244 SW3d 144, 151 (Mo, 2008) (holding that a finding of intellectual disability removed the defendant from consideration for the death penalty and was therefore not the equiva *413 lent of an aggravating factor that required a jury determination under Ring); State v Grell, 212 Ariz 516, 526-527; 135 P3d 696 (2006) (discussing mitigating factors from Atkins and Tison and concluding that there is no right to a jury trial on either set of factors under Apprendi and its progeny); Head v Hill, 277 Ga 255, 258; 587 SE2d 613 (2003) (opining that because intellectual disability was an “exemption” from the death penalty, it was a mitigating factor and not “the functional equivalent of an element” of the offense); In re Johnson, 334 F3d 403, 405 (CA 5, 2003) (stressing that a mitigating analysis of intellectual disability— required by the Eighth Amendment, per Atkins—was not the functional equivalent of an element of a greater offense). See also LaFave, § 26.4(i), pp 1018-1019 (“So far, lower courts have rejected arguments to equate the factors which as a matter of Eighth Amendment law are required for death eligibility with elements. The rules in Tison and Atkins have instead been treated as defenses to, not elements of, capital murder.”).[16]
*414 These cases are instructive in the instant case. Although the Court’s holding in Miller did not produce an outright ban on the imposition of life-without-parole sentences for juvenile homicide offenders, it nevertheless declared that in the vast majority of cases, that sentence will be disproportionate under the Eighth Amendment. Similar to the proportionality analysis of Atkins and Tison, the Supreme Court in Miller concluded that a certain characteristic of the offender rendered the maximum punishment authorized by statute to be disproportionate because that characteristic suggested diminished culpability on the part of the offender. And as in Atkins and Tison, the Supreme Court in Miller recognized that the Eighth Amendment required a certain framework of protections be considered before the maximum punishment authorized by statute could be imposed. Thus, the decision in Miller demonstrates that a juvenile offender’s age is a mitigating factor that is to be considered in rendering a proportionate sentence for a juvenile who is convicted of first-degree murder.[17] Our Legislature enacted MCL 769.25 in a way that essentially mirrored that which is required by Miller. Consideration of the Miller factors *415 under MCL 769.25 acts to mitigate punishment, rather than acting as the functional equivalent of an element of a greater offense.
F. CONCLUSION
In sum, we find that Miller’s individualized sentencing mandate, as incorporated by MCL 769.25, does not run afoul of Sixth Amendment precedent. A judge, not a jury, must determine whether to impose a life-without-parole sentence or a term-of-years sentence under MCL 769.25. Accordingly, we reject the result reached in Skinner and conclude that the prior panel in this case was correct in its analysis.
IV. APPLICATION TO THIS CASE
As for the outcome of the case before us, the prosecution asks that we do two things: (1) affirm the life-without-parole sentence imposed on defendant Hyatt and (2) articulate the appropriate standard of review on appeal for a juvenile life-without-parole sentence. In addressing these issues, we find it necessary to adhere to and incorporate Miller’s and Montgomery’s oft-repeated warnings about how rarely life-without-parole sentences for juvenile offenders will be proportionate.
A. THE TRULY RARE JUVENILE
As noted, Miller stopped shy of—and did not expressly consider—imposing a categorical ban on life-without-parole sentences for juveniles, but the Supreme Court repeatedly admonished sentencing authorities to impose the penalty of life without parole in only the rarest of circumstances, given the many mitigating factors of youth. In this regard, we note the *416 concerns raised in Miller—and in Roper and Graham for that matter—concerning how juveniles are different from adults in terms of their culpability and capacity for change. Notably, these cases underscored that juveniles tend to be less mature than adults, are more likely to possess an “underdeveloped sense of responsibility,” and are more likely to engage in reckless behavior. Roper, 543 US at 569 (citation and quotation marks omitted). Largely for these reasons, states almost universally prohibit juveniles from making many decisions that will have long-term effects such as “voting, serving on juries, or marrying without parental consent.” Id.
In addition, juveniles “are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure.” Id. Children also “have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings.” Miller, 567 US at 471 (citations, quotation marks, and alteration omitted). And juveniles have a lesser-defined sense of character than the typical adult; a juvenile’s “personality traits . . . are more transitory, less fixed.” Roper, 543 US at 570. Juveniles, noted the Court in Graham, “are more capable of change than are adults, and their actions are less likely to be evidence of irretrievably depraved character than are the actions of adults.” Graham, 560 US at 68 (citation and quotation marks omitted). In Graham, the Court explained that studies have demonstrated that “parts of the brain involved in behavior control continue to mature through late adolescence.” Id. Hence, “youth is more than a chronological fact,” and “its signature qualities are all transient.” Miller, 567 US at 476 (citations and quotation marks omitted).
*417 The Court explained in Roper, 543 US at 570, that for all these reasons, “[fjrom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor’s character deficiencies will be reformed.” “[T]he distinctive attributes of youth” reasoned the Court in Miller, 567 US at 472, “diminish the penological justifications for imposing the harshest sentence on juvenile offenders, even when they commit terrible crimes.” Therefore, when it comes to sentencing a juvenile, concern must be given to the offender’s youth and its attendant characteristics. This was the impetus for Miller’s individualized sentencing mandate. See id. at 473 (emphasizing that “youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole”), and id. at 474 (“By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—[mandatory sentencing schemes] prohibit a sentencing authority from assessing whether the law’s harshest term of imprisonment proportionately punishes a juvenile offender.”). However, this is not to say that a juvenile should not face consequences for his or her actions; rather, in rendering punishment, consideration must be given to the fact that juvenile offenders are generally less culpable than their adult counterparts. Graham, 560 US at 68.
Because juveniles are different from adults and have still-evolving characters, the Supreme Court has noted how difficult it can be for a sentencer to conclude that life without parole, the harshest possible penalty for a juvenile homicide offender, is proportionate to a particular offense and offender. In Roper, 543 US at 569, the Court recognized that “general differences” between juveniles and adults “demonstrate that juvenile *418 offenders cannot with reliability be classified among the worst offenders.” (Emphasis added.) The Roper Court, citing Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am Psychologist 1009, 1014-1016 (2003), also remarked that “[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.” Roper, 543 US at 573. If this determination is difficult for even trained psychologists, we would be remiss if we did not acknowledge our concerns about sentencing courts—or reviewing courts, for that matter—accurately assessing, or in essence forecasting, whether an individual who committed a crime while still a minor is and will remain irreparably corrupt for the rest of his or her life and on the basis of that assessment accurately meting out a proportionate sentence.
These concerns led the Court in Miller to caution that “given all we have said in Roper, Graham, and this decision about children’s diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon” Miller, 567 US at 479 (emphasis added). The Court returned in Montgomery to the idea of the infrequency of proportionate life-without-parole sentences for juvenile offenders when it declared that “[although Miller did not foreclose a sentencer’s ability to impose life without parole on a juvenile, the Court explained that a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect irreparable corruption.” Montgomery, 577 US at _; 136 S Ct at 726 (citation and quotation marks omitted; *419 emphasis added). In fact, the majority opinion in Montgomery used the words “rare” or “rarest” six times in describing when a life-without-parole sentence would be appropriate after Miller. See id. at_; 136 S Ct at 726 (declaring life without parole to be disproportionate “for all but the rarest of children”) (citation and quotation marks omitted); id. at _; 136 S Ct at 733 (emphasizing that although “a sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified,” a life-without-parole sentence will by and large be disproportionate); id. at _; 136 S Ct at 734 (stating that “Miller determined that sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption,” explaining that Miller declared a life-without-parole sentence to be unconstitutional “for all but the rarest of juvenile offenders,” stating that “[a]fter Miller, it will be the rare juvenile offender who can receive that same sentence,” and noting that Miller “drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption”) (citation and quotation marks omitted).
B. IMPLEMENTING MILLER AT SENTENCING
The cautionary language employed by the Court in Roper, Graham, Miller, and Montgomery must be honored by this Court. In light of this language and our need to review defendant Hyatt’s sentence under Miller, we conclude that when sentencing a juvenile offender, a trial court must begin with the understanding that in all but the rarest of circumstances, a life-without-parole sentence will be disproportionate for the juvenile offender at issue. For that reason, a *420 sentencing court must begin its analysis with the understanding that life without parole is, unequivocally, appropriate only in rare cases. Sentencing courts are to do more than pay mere lip service to the demands of Miller. A sentencing court must operate under the understanding that life without parole is, more often than not, not just inappropriate, but a violation of the juvenile’s constitutional rights. As explained in Montgomery:
Miller, then, did more than require a sentencer to consider a juvenile offender’s youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of the distinctive attributes of youth. Even if a court considers a child’s age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects unfortunate yet transient immaturity. Because Miller determined that sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption, it rendered life without parole an unconstitutional penalty for a class of defenders because of their status— that is, juvenile offenders whose crimes reflect the transient immaturity of youth. [Montgomery, 577 US at _; 136 S Ct at 734 (citations and quotation marks omitted).]
We note that nearly every situation in which a sentencing court is asked to weigh in on the appropriateness of a life-without-parole sentence will involve heinous and oftentimes abhorrent details. After all, the sentence can only be imposed for the worst homicide offenses. However, the fact that a vile offense occurred is not enough, by itself, to warrant imposition of a life-without-parole sentence. The court must undertake a searching inquiry into the particular juvenile, as well as the particular offense, and make the admittedly difficult decision of determining whether this is *421 the truly rare juvenile for whom life without parole is constitutionally proportionate as compared to the more common and constitutionally protected juvenile whose conduct was due to transient immaturity for the reasons addressed by our United States Supreme Court. And in making this determination in a way that implements the stern rebuke of Miller and Montgomery, the sentencing court must operate under the notion that more likely than not, life without parole is not proportionate.
That this approach is required under Miller becomes even more apparent when one considers the warnings in Roper, Graham, and Miller about how difficult it is for even a trained psychologist, let alone a sentencing judge, to make a definitive determination regarding a juvenile’s capacity for reform. See Roper, 543 US at 573 (remarking that the transient qualities of youth make determinations about a juvenile’s capability for reform exceedingly difficult). In fact, the Court in Graham, 560 US at 77-78, felt so strongly about the difficulty of distinguishing “the few incorrigible juvenile offenders from the many that have the capacity for change” that it rejected—in the case of nonhomicide juvenile offenders—a case-specific sentencing scheme similar to the one it later adopted in Miller, and decided that because the determination was so difficult, it would instead impose a categorical ban in nonhomicide cases. Because MCL 769.25 permits a case-by-case determination upon the filing of the requisite motion, trial courts must operate with the understanding that, more likely than not, a life-without-parole sentence is disproportionate for the juvenile offender being sentenced. Indeed, as the Supreme Court warned in Roper, Graham, and Miller, given the unique and transient qualities of youth, even the most thorough, well-intentioned, and earnest sentencing courts en *422 counter a significant risk of reaching the wrong conclusion about a juvenile’s character being irreparably corrupt. And this risk carries with it the grave consequences of violating the Eighth Amendment and of denying an undeserving individual—who it must be remembered is nevertheless deserving of significant punishment because of the conviction—an opportunity to leave the prison he or she entered while still a child. It was not a hollow exercise for the Supreme Court in Miller and Montgomery to repeatedly emphasize how rarely a life-without-parole sentence will be proportionate. Hence, we emphasize the caution with which a sentencing court must view the imposition of life without parole for juvenile offenders.
C. STANDARD OP APPELLATE REVIEW
The same concerns noted above exist on appeal when a juvenile challenges the imposition of his or her life-without-parole sentence. That leads us to a second question, one raised by the prosecution and one that is inherently necessary in weighing in on defendant Hyatt’s sentence in the instant case. That is, given the limited circumstances in which a life-without-parole sentence is proportionate and constitutional, what is the appropriate standard of appellate review for that sentence?
As noted by our Supreme Court in People v Milbourn, 435 Mich 630, 635; 461 NW2d 1 (1990), our Legislature, in setting forth a range of appropriate punishments for criminal offenses, has entrusted sentencing courts with the responsibility of selecting the appropriate punishment from statutorily authorized sentencing ranges. These sentencing ranges embody the “principle of proportionality” because they allow a sentencing judge to tailor the sentence to the particu *423 lar offense and offender at issue. Id. Accordingly, the Milbourn Court believed “that the Legislature’s purpose” in enacting such a scheme was “best served by requiring judicial sentencing discretion to be exercised according to the same principle of proportionality that has guided the Legislature in its allocation of punishment over the entire spectrum of criminal behavior.” Id. at 635-636. See also id. at 651 (“The Legislature then left to the judiciary, with regard to most crimes, the task of determining the sentence to be imposed upon each offender within given bounds.”). The limit on the judicial discretion to be exercised when imposing penalties is that the punishment should be proportionate to the offender and the offense. Id. at 651-652. Hence, appellate review of the sentence imposed is for abuse of discretion, to determine whether the sentence violates the principle of proportionality, “which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.” Id. at 636, 654.
Turning to the instant case, we believe that the appropriate standard of review for cases in which a judge imposes a sentence of life without parole on a juvenile defendant is a common three-fold standard, the likes of which are applied in a variety of contexts. Any fact-finding by the trial court is to be reviewed for clear error, any questions of law are to be reviewed de novo, and the court’s ultimate determination regarding the sentence imposed is to be reviewed for an abuse of discretion. See People v Hardy, 494 Mich 430, 438; 835 NW2d 340 (2013) (describing the standard of review for a sentencing court’s findings of fact and conclusions of law); Milbourn, 435 Mich at 636, 654 (applying the abuse-of-discretion standard to sentencing review).
*424 However, the abuse-of-discretion standard requires further explanation in this context. Because of the unique nature of the punishment of a life-without-parole sentence for juveniles and the mitigating qualities of youth, we are obligated to clarify what the abuse-of-discretion standard should look like in the context of life-without-parole sentences for juveniles. As will be discussed in more detail later in this opinion, we hold that the imposition of a life-without-parole sentence on a juvenile requires a heightened degree of scrutiny regarding whether a life-without-parole sentence is proportionate to a particular juvenile offender, and even under this deferential standard, an appellate court should view such a sentence as inherently suspect.
To provide meaningful appellate review under an abuse-of-discretion standard for a life-without-parole sentence imposed on a juvenile, the reviewing court must remain mindful that life without parole is the maximum punishment that may be imposed for a juvenile offender under MCL 769.25. That this is the harshest penalty available under the law raises the stakes not just for the defendant, but also for appellate review of the trial court’s sentencing decision. Hence, appellate review of a life-without-parole sentence imposed on a juvenile cannot be a mere rubber-stamping of the penalty handed out by the sentencing court. In Milbourn, our Supreme Court repeatedly warned that the maximum penalty available under the law is to be imposed for only the most serious offenders and the most serious offenses; otherwise, it would risk failing the proportionality test. Milbourn, 435 Mich at 645-646. To impose the maximum possible penalty “in the face of compelling mitigating circumstances would run against this principle [of proportionality] and the legislative scheme.” Id. at 653. Therefore, in terms of *425 appellate review, a reviewing court is justifiably skeptical of a sentence that represents the maximum available punishment, because such punishment is only available in limited, i.e., the most serious and extreme, circumstances. See id. at 654. To impose the maximum possible penalty, the case must “present a combination of circumstances placing the offender in . . . the most serious. . . class with respect to the particular crime . . . .” Id. at 654. Accordingly, sentencing courts should guard against routinely imposing the most severe penalty authorized by statute. Id. at 645. Moreover, we pay heed to Milbourn’s cautionary sentiment that the unjust imposition of a maximum sentence has the potential to shake “[t]he public’s faith in the just and fair administration of justice . . . .” Id.
We use the language employed in Milbourn as our starting point, but point out that Milbourn⅛ sentiments ring even truer in the case of life-without-parole sentences for juveniles. Those sentences are deemed to be an “unconstitutional penalty for a class of defendants because of their status—that is, juvenile offenders whose crimes reflect the transient immaturity of youth.” Montgomery, 577 US at _; 136 S Ct at 734 (citation and quotation marks omitted). Applying the cautionary language of Milbourn—that the imposition of the harshest possible punishment is to be reserved and rendered with caution—in the context of Miller’s and Montgomery’s repeated and express warnings about how infrequently a life-without-parole sentence will be constitutionally proportionate for juveniles, we are convinced that appellate review, although done under the abuse-of-discretion standard, should consider a juvenile life-without-parole sentence as inherently suspect. While we do not suggest a presumption against the constitutionality of that sentence, we would be remiss not to note that review of that sen *426 tence requires a searching inquiry into the record with the understanding that, more likely than not, a life-without-parole sentence imposed on a juvenile is disproportionate. See, generally, Miller, 567 US at 473; Milbourn, 435 Mich at 645-646. See also Farrell, Strict Scrutiny Under the Eighth Amendment, 40 Fla St U L Rev 853, 856 (2013) (stating that there is “reason to be skeptical” of the idea that life without parole—a particularly harsh penalty—is proportionate for a class of offenders such as juveniles who are widely recognized as having lessened culpability). Indeed, as the Court warned in Milbourn, 435 Mich at 653, “[w]ith regard to the principle of proportionality, it is our judgment that the imposition of the maximum possible sentence in the face of compelling mitigating circumstances would run against this principle ....” (Emphasis added.) In Roper, Miller, Graham, and Montgomery, the Supreme Court consistently described the numerous ways in which mitigating circumstances—which are compelling enough given the characteristics of youth to warrant a categorical bar on mandatory life-without-parole sentences—are often present in the case of juveniles on account of their youth. These mitigating circumstances —and the need for proper consideration of mitigating circumstances in an individualized sentencing scheme —were the driving force behind Miller’s prohibition on mandatory life-without-parole sentences for juveniles. And Miller and Montgomery repeatedly emphasized that a life-without-parole sentence will only be constitutionally proportionate for the truly rare juvenile.
Accordingly, to give effect to our Supreme Court’s decision in Milbourn and the United States Supreme Court’s direction in Miller and Montgomery, an appellate court must conduct a searching inquiry and view as inherently suspect any life-without-parole sentence *427 imposed on a juvenile offender under MCL 769.25. See Roper, 543 US at 570 (announcing that the differences between juveniles and adults “render suspect any conclusion that a juvenile falls among the worst offenders”). An appellate court must give meaningful review to a juvenile life-without-parole sentence and cannot merely rubber-stamp the trial court’s sentencing decision.
As a tool for undertaking this appellate review, we find it appropriate to borrow from a framework employed by some federal courts. As noted, MCL 769.25 requires weighing a variety of factors in determining whether the juvenile being sentenced is the rare juvenile offender for whom life without parole is an appropriate sentence. In determining whether the sentencing court abused its discretion in weighing the factors and arriving at its conclusion, we find instructive the following analysis found in United States v Haack, 403 F3d 997, 1004 (CA 8, 2005), noting certain situations that constitute an abuse of discretion:[18]
A discretionary sentencing ruling, similarly, may be [an abuse of discretion] if a sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case.
*428 D. THE INSTANT CASE
Turning to the instant case, we find the trial court committed an error of law by failing to adhere to Miller's and Montgomery’s directives about the rarity with which a life-without-parole sentence should be imposed. When deciding to sentence defendant Hyatt to life without parole, the trial court focused on the Miller factors. However, the court gave no credence to Miller’s repeated warnings that a life-without-parole sentence should only be imposed on the rare or uncommon juvenile offender. This is inconsistent with both Miller and Montgomery ,[19] Indeed, the Court’s decisions in Miller and Montgomery make clear that sentencing a juvenile to life without parole is more than a simple consideration of a set of factors. In order to give any meaning to Miller’s discussions about proportionality and the mitigating circumstances associated with youth, a sentencing court must heed Miller’s discussion of how rarely a life-without-parole sentence will be proportionate. In order to warrant the imposition of a life-without-parole sentence, the juvenile must be, as Miller unequivocally stated, the truly rare individual who is incapable of reform.[20]
Moreover, with regard to the sentencing decision in the instant case, we are concerned that the trial court, in concluding that life without parole was warranted in this case, emphasized the opinion of the psychologist who testified at the Miller hearing that defendant *429 Hyatt’s prognosis for change in the next five years was poor. This focus on a short, five-year period for redemption cannot be reconciled with Miller, which holds that a life-without-parole sentence will be proportionate for the juvenile who is irreparably corrupt and incapable of change—not one who is incapable of change within the next five years. The capacity for change within five years hardly seems of any relevance to the decision of whether an individual who committed a crime while a minor is irreparably corrupt and, thus, will remain corrupt and wholly incapable of rehabilitation for the remainder of his or her life expectancy, which could easily be another 60 to 80 years.
Given all that occurred at the sentencing hearing in this case, we feel compelled to remand for resentenc-ing; the trial court must not only consider the Miller factors, but decide whether defendant Hyatt is the truly rare juvenile mentioned in Miller who is incorrigible and incapable of reform. Accordingly, we reverse defendant Hyatt’s sentence and remand to the trial court for resentencing. On resentencing, the court is to implement the directives of Miller and Montgomery and to be mindful that those cases caution against the imposition of a life-without-parole sentence except in the rarest of circumstances. Hence, it should operate with the understanding that, more likely than not, life without parole is a disproportionate sentence for defendant Hyatt.
V. CONCLUSION
We resolve the conflict created between the prior panel in this case and the majority in Skinner by concluding that a judge, not a jury, must determine whether to sentence a juvenile to life without parole under MCL 769.25. With regard to the instant case, we *430 vacate defendant Hyatt’s sentence and remand for further proceedings consistent with this decision. We do not retain jurisdiction.
SHAPIRO, P.J., and MARKEY and Stephens, JJ., concurred with Beckering, J.

 The instant matter involving defendant, Kenya Hyatt, was initially consolidated with Docket Nos. 323454 and 323876, but this Court has since, on its own motion, vacated its previous order consolidating the cases to allow defendant Hyatt’s case to proceed on its own before this special conflict panel. People v Perkins, unpublished order of the Court of Appeals, entered April 26, 2016 (Docket Nos. 323454, 323876, and 325741).

 As will be discussed, our Legislature, in MCL 769.25, dubbed these the “Miller factors.”

 See People v Carp, 496 Mich 440; 852 NW2d 801 (2014), vacated sub nom Davis v Michigan, 577 US_; 136 S Ct 1356 (2016) (the United States Supreme Court vacated the Michigan Supreme Court’s decision in Carp and remanded the case for further consideration in light of Montgomery v Louisiana, 577 US_; 136 S Ct 718; 193 L Ed 2d 599 (2016); the Michigan Supreme Court ultimately vacated the Carp defendant’s sentence, People v Carp, 499 Mich 903 (2016)).

 The opinion in Carp was later vacated as described in note 3 of this opinion.

 Ring v Arizona, 536 US 584, 613; 122 S Ct 2428; 153 L Ed 2d 556 (2002) (Scalia, J., concurring).

 In response to Alleyne, our Supreme Court struck the statutory requirement that made the use of sentencing guidelines—used to calculate a defendant’s minimum sentence in Michigan—mandatory. People v Lockridge, 498 Mich 358, 364; 870 NW2d 502 (2015).

 Again, neither the panel in Skinner nor the prior panel in this case had the benefit of the Montgomery analysis.

 Although they are not binding on this Court, we note that two of the only cases to consider this issue in another state reached the same result regarding whether Miller requires a jury determination. See State v Fletcher, 149 So 3d 934, 943; La App 49, 303 (2d Cir, October 1, 2014); People v Gutierrez, unpublished opinion of the California Court of Appeal, issued June 22, 2016 (Docket No. B261989), pp 6-7. Notably, in Fletcher, 149 So 3d at 943, the Louisiana Court of Appeals rejected the idea that Miller created a “new statutory maximum” for purposes of Apprendi; further, Fletcher rejected the idea that Miller required proof of an additional element before a sentencing authority could impose a life-without-parole sentence. Rather, reasoned the court in Fletcher, Miller “merely mandates a hearing at which youth-related mitigating *402 factors can be presented to the sentencer and considered in making a determination of whether the life sentence imposed upon a juvenile killer should be with or without parole eligibility.” Id.

 For instance, Miller requires a hearing at which a court may receive evidence about, among other matters, the circumstances of the homicide, including the juvenile’s role in the offense. Miller, 567 US at 475-476, 480. The hearing will almost inevitably produce conflicting evidence about the extent of the offender’s role, with the prosecution likely seeking to maximize the juvenile defendant’s involvement in the homicide and the juvenile defendant seeking to minimize that role. Faced with conflicting evidence, a sentencing judge tasked with weighing the juvenile’s role in the offense will necessarily have to make a determination about which evidence to believe, i.e., make a factual finding.

 We briefly note Justice Breyer’s concurring opinion in Miller, in which he concluded that in order to impose a life-without-parole sentence on a juvenile offender, there must be a finding that the offender killed or intended to kill. Miller, 567 US 489-490 (Breyer, J., concurring). A life-without-parole sentence should be, according to Justice Breyer, “forbid[den]” without such a finding. Id. at 490. If this view were the current state of the law, it might change our Sixth Amendment analysis, particularly in this case, which involved felony murder in a multiple-offender situation. However, Justice Breyer’s view was not adopted by the majority in Miller, and we see no Sixth Amendment implications in the majority’s decision in Miller.

 The suggestion that our Supreme Court declared in Carp, 496 Mich at 458, that MCL 769.25 created a “default” sentence of a term of years in all instances is inaccurate. Although Carp mentioned a default sentence, it did so in describing the procedure for sentencing a juvenile in the absence of a motion filed by the prosecution seeking a life-without-parole sentence. Id.

 Although, decisions from other states are not binding, we may consider them as persuasive authority. People v Jackson, 292 Mich App 583, 595 n 3; 808 NW2d 541 (2011).

 Pursuant to 18 USC 3553(a):
[t]he court, in determining the particular sentence to be imposed, shall consider—
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner!.]

 As aptly noted by the panel in Skinner, 312 Mich App at 33, the “passing reference to ‘a judge or jury ” in Miller is hardly illuminating with regard to the issue at hand. The issue before the Court in Miller was limited to Eighth Amendment concerns, and the Court was not called on to weigh in on the matter now before us. Hence, like the panel in Skinner—and, for that matter, our Supreme Court in Carp, 496 Mich at 491 n 20—we assign no significance to the phrase “judge or jury” as it is used in Miller.

 lb be sure, however, Miller made clear that mitigation was more often than not the appropriate route, emphasizing that a life-without-parole sentence would be proportionate for only the rare juvenile “whose crime reflects irreparable corruption.” Miller, 567 US at 479-480 (citation and quotation marks omitted).

 The United States Supreme Court has denied leave in some of these cases, see, e.g., Galindo v Nebraska, 559 US 1010 (2010), but has yet to expressly weigh in on this issue post-Apprendi. With regard to the Atkins line of cases, the United States Supreme Court in Schriro v Smith, 546 US 6, 7; 126 S Ct 7; 163 L Ed 2d 6 (2005), left to the states to determine how to implement Atkins and to decide whether a judge or jury should assess the mitigating factor of intellectual disability. We also note that with regard to the offender’s role in the offense, the Supreme Court in Cabana v Bullock, 474 US 376; 106 S Ct 689; 88 L Ed 2d 704 (1986), abrogated in part on other grounds by Pope v Illinois, 481 US 497, 503 n 7; 107 S Ct 1918; 95 L Ed 2d 439 (1987), discussed Enmund v Florida, 458 US 782; 102 S Ct 3368; 73 L Ed 2d 1140 (1982), a case which served as a precursor to Tison and which drew similar conclusions about the Eighth Amendment’s concern with the offender’s role in a capital offense. Pertinent to our discussion, the Supreme Court in Cabana held that the offender’s role in the offense did not concern guilt or innocence and did not establish an element of capital murder that had to be found by a jury. Cabana, 474 US at 385. Rather, determination of the offender’s role was a consideration of proportionality for purposes of *414 the Eighth Amendment and was not a decision that required a jury determination. Id. Accordingly, to the extent the Supreme Court has addressed this issue, it has determined that a finding on mitigating factors does not implicate the right to a jury trial. However, before we place too much stock in Cabana, we must note that the case was decided prior to Apprendi. Accordingly, we place greater emphasis on the state court and lower federal court decisions already discussed in this opinion.

 Accordingly, we caution that if the prosecuting attorney moves for a life-without-parole sentence under MCL 769.25(2), the resultant Miller hearing must not be treated as a perfunctory exercise that will automatically authorize the imposition of a life-without-parole sentence. That approach would defy those principles that were first announced in Miller and that were made even clearer in Montgomery, life without parole is to be imposed on juvenile offenders in only the rarest of cases.

 In People v Steanhouse, 313 Mich App 1, 43-44, 46-47; 880 NW2d 297 (2015), lv gtd 499 Mich 934 (2016), this Court declined to apply Haack, because that case concerned sentencing factors listed in 18 USC 3553(a), and sentencing courts in Michigan are not required to look at those factors. In this case, by contrast, because a juvenile life-without-parole sentence requires consideration of the Miller factors, we find instructive Haack’s description of certain situations that constitute an abuse of discretion.

 We would be remiss if we did not note that the trial court lacked the benefit of Montgomery at the time of sentencing.

 As noted earlier, we acknowledge that, as articulated as far back as Roper, this determination is a difficult one to make. We also note that MCL 769.25 and Miller offer little in terms of guidance as to how to make this difficult decision. Nevertheless, the current statutory system is the one under which we are required to operate.