# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
April 11, 2017

Plaintiff-Appellee,

v

No. 329091
Kalamazoo Circuit Court
LC No. 2014-000785-FJ

VICTOR MANUEL GARAY,

Defendant-Appellant.

Before: STEPHENS, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of first-degree murder, MCL 750.316; conspiracy to commit murder, MCL 750.157a; MCL 750.316; and two counts of possession of a firearm during the commission of a felony, MCL 750.227b. The trial court sentenced defendant to life imprisonment without the possibility of parole for the murder and conspiracy convictions and to two years' imprisonment for the felony-firearm convictions. Defendant appeals as of right. We affirm defendant's convictions, reverse the life-without-parole sentences, and remand for resentencing.

## I. BACKGROUND

This case involves the shooting death of 13-year-old Michael Day on May 26, 2014, on Race Street in the Edison neighborhood of Kalamazoo, Michigan. The Edison neighborhood was home to two gangs: Trapp Money and the Washington Street Boys. Day was a member of the Washington Street Boys and defendant admitted a relationship with Trapp Money.

Defendant, who was 16-years-old at the time of trial, was tried with his two adult male codefendants before separate juries. Testimony was received from many live witnesses. However, two juvenile sisters, N and T, whose preliminary examination testimony placed defendant in the proximity of the shooting, were declared unavailable for trial over the defense's objection. The parties made a record of the objection but neither the sisters nor their father were examined regarding their unavailability in open court. Instead, the court received information regarding threats made to the witnesses on Facebook and the prosecutor provided information that the father of the two girls communicated that he would not allow them to testify when he brought them to court under subpoena. The court admitted their preliminary examination testimony, finding their refusal to testify because of intimidation made them unavailable. Numerous other fact witnesses testified. Several police officers, also, testified including Officer

-1-

Gary Latham from the crime laboratory, who provided testimony regarding the weapon used to shoot the victim, the direction of weapon fire and other related issues.

Subsequent to the jury trial, the court was apprised of potential juror misconduct. Specifically, a juror reported that another juror was acquainted with Officer Latham and vouched for his expertise in weapons matters to the jury. Additionally, the juror reported that members of the jury used cell phones during the trial proceedings. The court held a hearing on this issue with the reporting juror placed under oath. At the conclusion of that hearing, the court declined to order a new trial.

## II. ADMISSION OF THE PRELIMINARY EXAMINATION TESTIMONY OF N AND T

On appeal, defendant argues that the trial court erred in declaring sisters N and T unavailable as witnesses under MRE 804(a) and admitting their preliminary examination testimony under MRE 804(b)(1). We review a trial court's evidentiary decisions for an abuse of discretion. *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id.* at 217.

During trial, the prosecutor asked the trial court to declare that N and T were unavailable as witnesses under MRE 804(a) and to admit their preliminary examination testimony. According to the prosecutor, N and T were subpoenaed and had been contacted a number of times. Their father informed the members of the Kalamazoo Department of Public safety who had made the contact that N and T would not appear because they had been threatened. However, N and T were brought to court by their father on the day that they were to appear, but their father stated that their presence was "a courtesy." The sisters, who had been threatened, would not testify. Detective Corey Ghiringhelli checked the Facebook page of either N or T, and he saw a picture of the girl testifying at the preliminary examination with the comment "that bitch should die." The trial court declared the two sisters unavailable and allowed the jury to hear their preliminary examination testimony. The trial court noted that telephone messages left by its staff with the father of N and T had not been returned.

" 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is not admissible unless it falls within an exception to the hearsay rule. MRE 802; *People v McDade*, 301 Mich App 343, 353; 836 NW2d 266 (2013). MRE 804 provides exceptions to the hearsay rule for when the declarant is unavailable as a witness. *People v Duncan*, 494 Mich 713, 724; 835 NW2d 399 (2013). MRE 804(a) lists situations when a declarant is unavailable. Under MRE 804(b)(1), when a declarant is unavailable, testimony given by the declarant "as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination" is not excluded by the hearsay rule. Factors that a trial court should consider in determining whether the party had a similar motive to develop the testimony include:

> (1) whether the party opposing the testimony "had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a

substantially similar issue"; (2) the nature of the two proceedings—both what is at stake and the applicable burden of proof; and (3) whether the party opposing the testimony in fact undertook to cross-examine the witness (both the employed and available but forgone opportunities).  [*People v Farquharson*, 274 Mich App 268, 278; 731 NW2d 797 (2007).]

The trial court did not abuse its discretion in declaring N and T to be unavailable.  The decision of N and T's father not to allow the two sisters to testify is not expressly addressed under MRE 804(a), but it is of the same character as other situations outlined in the rule.  See *People v Adams*, 233 Mich App 652, 658; 592 NW2d 794 (1999).  Additionally, because N and T appeared on the fourth day of trial pursuant to a subpoena, their departure from the courthouse and their refusal to return to testify constituted a refusal to testify "despite an order of the court to do so."  MRE 804(a)(2); *Adams*, 233 Mich App at 659 n 6. [1]  Based on their father's refusal to allow them to testify and his refusal to respond to the trial court's attempts for contact, N and T were certainly unavailable according to the ordinary meaning of the word.  *Id.* at 657-659.  Furthermore, testimony at trial regarding the dangerous character of the Edison neighborhood, the Facebook threat, and the father's refusal to allow N and T to testify out of fear for their safety shows that the reason for the refusal to testify was self-preservation.  *Id.*  While the better practice would have been to make a record of their unavailability by examining each as to any threats received and the factors that influenced their refusal to testify, the trial court's decision to declare N and T unavailable was within the range of reasonable and principled outcomes.  *Unger*, 278 Mich App at 217.

The trial court also did not abuse its discretion in admitting the preliminary examination testimony of N and T under MRE 804(b)(1).  First, there is no dispute that the preliminary examination testimony was given "at another hearing of the same or a different proceeding."  MRE 804(b)(1).  Second, defendant had "an opportunity and similar motive to develop the testimony" at the preliminary examination.  *Id.*  The purpose of a preliminary examination is "to determine if a crime has been committed and, if so, if there is probable cause to believe that the defendant committed it."  *People v Johnson*, 427 Mich 98, 104; 398 NW2d 219 (1986).  The prosecutor's purpose in presenting the testimony of N and T at the preliminary examination, i.e., to show that defendant conspired with codefendant Rashad Perez to shoot at members of the Washington Street Boys and that defendant was the person who shot Michael, was the same purpose that the prosecutor had in presenting their testimony at trial.  Thus, defendant had an "interest of substantially similar intensity" in proving or disproving the testimony of N and T.  *Farquharson*, 274 Mich App at 268.  Additionally, although the burden of proof was less at the preliminary examination, see *People v Yost*, 468 Mich 122, 126; 659 NW2d 604 (2003), defendant had a similar motive to cross-examine N and T at both proceedings—defendant was motivated to show that their testimony regarding what they saw and heard from their porch lacked credibility or was not accurate.  *Farquharson*, 274 Mich App at 268.  And defendant did, in fact, cross-examine N and T with regard to their credibility.  Under these circumstances, the trial court's decision to admit the preliminary examination testimony of N and T fell within the range of reasonable and principled outcomes.  *Unger*, 278 Mich App at 217.

---

[1] We find no merit to defendant's argument that the trial court should have ordered N and T to testify.  Because the prosecutor had subpoenaed them, there was already an order for them to testify.

Defendant also argues that the admission of the preliminary examination testimony of N and T violated his right of confrontation. We review constitutional questions de novo. *People v Pitts*, 222 Mich App 260, 263; 564 NW2d 93 (1997).

A defendant shall enjoy the right to be confronted with the witnesses against him. US Const, Am VI. Under the Confrontation Clause, the testimonial statements of witnesses who are absent from trial are not admissible unless the witness was unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. *Crawford v Washington*, 541 US 36, 59; 124 S Ct 1354; 158 L Ed 2d 177 (2004). Testimony given at a preliminary examination is a testimonial statement. *Id.* at 68. "The Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish." *United States v Owens*, 484 US 554, 559; 108 S Ct 838; 98 L Ed 2d 951 (1988) (quotation marks, citation, and alteration marks omitted).

"Former testimony is admissible at trial under both MRE 804(b)(1) and the Confrontation Clause as long as the witness is unavailable for trial and was subject to cross-examination during the prior testimony." *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009). Because N and T were unavailable for trial and defendant cross-examined them at the preliminary examination, the admission of their preliminary examination testimony did not violate defendant's right of confrontation. *Crawford*, 541 US at 50; *Garland*, 286 Mich App at 7.

## III. JUROR MISCONDUCT

Defendant next argues that his convictions should be reversed because the jury was subject to extraneous influences. We review a trial court's decision to grant or deny a motion for a new trial for an abuse of discretion. *People v Armstrong*, 305 Mich App 230, 241; 851 NW2d 856 (2014).

A defendant has a right to be tried by a fair and impartial jury. *Duncan v Louisiana*, 391 US 145, 153; 88 S Ct 1444; 20 L Ed 2d 491 (1968). Consistent with this right, a jury may only consider the evidence that is presented in court. *People v Stokes*, 312 Mich App 181, 187; 877 NW2d 752 (2015). A jury's consideration of extraneous facts not introduced into evidence deprives a defendant of his constitutional rights of confrontation, cross-examination, and effective assistance of counsel. *Id.* To establish that an extraneous influence was error requiring reversal, a defendant must prove two points: (1) the jury was exposed to an extraneous influence and (2) the extraneous influence created a real and substantial possibility that it could have affected the jury's verdict. *People v Budzyn*, 456 Mich 77, 88-89; 566 NW2d 229 (1997). To prove this second point, the defendant must "demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extraneous influence and the adverse verdict." *Id.* at 89. If the defendant proves these two points, then the burden shifts to the prosecution to demonstrate that the error was harmless beyond a reasonable doubt. *Id.* The prosecution may do so by proving that "the extraneous

influence was duplicative of evidence produced at trial or the evidence of [the defendant's] guilt was overwhelming." *Id.* at 89-90.

Defendant sought to show that the jury was subject to extraneous influences through the affidavit and testimony of Juror DG. Firmly established in the common law is a prohibition against the admission of juror testimony to impeach a jury verdict. *People v Fletcher*, 260 Mich App 531, 539; 679 NW2d 127 (2004). The only recognized exception to this rule relates to situations in which the jury verdict was affected by an extraneous influence. *Id.* Thus, where there is evidence to suggest that the verdict was affected by an influence external to the trial proceedings, a court may consider juror testimony to impeach a verdict. *Id.* But where the alleged misconduct relates to influences internal to the trial proceedings, a trial court may not invade the sanctity of the deliberative process. *Id.* The distinction between external and internal influences is not based on the location of the alleged misconduct. *Budzyn*, 456 Mich at 91. "Rather, the nature of the allegation determinations whether the allegation is intrinsic to the jury's deliberative process or whether it is an outside or extraneous influence." *Id.* "Generally speaking, information is deemed 'extraneous' if it derives from a source 'external' to the jury. 'External' matters include publicity and information related specifically to the case the jurors are meant to decide, while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room." *Warger v Shauers*, ___ US ___, ___; 135 S Ct 521, 529; 190 L Ed 2d 422 (2014) (citation omitted).

Defendant claims that the jury was subject to extraneous influences through their use of cell phones during deliberations. Juror DG testified that jurors, himself included, used their cell phone on breaks. Juror DG used his cell phone for text messaging, and he had no personal knowledge for what purposes the other jurors used their cell phones. Accordingly, defendant has not established that the jury was subject to any extraneous influence through the use of cell phones. *Budzyn*, 459 Mich at 88-89.

Defendant also claims that the jury was subject to extraneous influences through Juror 8. According to Juror DG, Juror 8 told the jurors that he knew Officer Gary Latham well, that Officer Latham was an expert with firearms, and that they could be extremely confident in Officer Latham's testimony. Defendant has not established that the jury was subject to an extraneous influence through Juror 8. *Id.* Internal matters include the general body of experiences that jurors are understood to bring with them to the jury room. *Warger*, ___ US at ___; 135 S Ct at 529. Juror 8's statements regarding Officer Latham were based on his own personal knowledge of and experience with the officer. The statements were not based on anything that Juror 8 had read or heard about the case. While Juror 8 should have disclosed his relationship with Officer Latham during voir dire, Juror 8's statements did not provide him or the other jurors with any knowledge regarding Day's murder. *Id.* at ___; 135 S Ct at 529.

Even if Juror 8's statements were an extraneous influence, and assuming that there was a real and substantial possibility that the statement could have affected the jury's verdict, *Budzyn*, 456 Mich at 89, the error was harmless. Although the testimony from the three witnesses who were with Day when he was shot indicated that the only person they saw with a gun was Perez, Joshua Parker, who lived in the area, testified that, based on the different "pops" he heard, there were at least two, if not three, guns fired. Specifically, regarding defendant, Parker testified that he saw defendant, holding a gun, come down the alley from Race Street to James Street. He

identified the gun that defendant had as the .16-gauge shotgun that was later found by Detective Frederick Hug at the basement landing of an abandoned house on James Street. Parker saw defendant put the shotgun in the grass or thickets. About 15 to 20 minutes later, Parker saw defendant run down the alley towards Race Street with the shotgun "laterally" by his knees. Parker then heard multiple gunshots. Within 15 to 20 seconds, Parker saw defendant run down the alley towards James Street. Defendant, who was still holding the shotgun, was "visibly in a hurry." T, who lived at the corner of Hays Park Avenue and James Street, testified that she heard defendant and Perez talking about "airing out" any members of the Washington Street Boys that they saw. T, as well as N, saw Perez and defendant split up. Perez went down Hays Park Avenue, while defendant went down the alley. After N and T heard gunshots, defendant came to their house. According to them, as well as DeShawndra Spivey, who was visiting the two sisters, defendant was wearing gloves and had bullets with him. Spivey testified that defendant said, "he shot." Lieutenant Jeffrey Crump, an expert in firearms identification, testified that the shotgun hull found in the alley by Officer Latham, which was a Hornady .20-gauge SST slug, was fired from the .16-gauge shotgun. Lieutenant Crump also testified that the bullet recovered from Day's chest and the sabot found by Officer Latham on the sidewalk south of the alley were consistent with the bullets and sabots in the Hornady .20-gauge SST slugs that he purchased. Additionally, Officer Latham testified that the bullet he recovered from the tire of the Cadillac, which was parked on Race Street in front of the area where Day was shot, was consistent with a Hornady .20-gauage SST slug and that, because of the location of the hole in the tire, the bullet had to have come from "the north, northeast" of where it had entered the tire. Based on this testimony, the alleged error that exposed the jury to extraneous influence was harmless beyond a reasonable doubt. *Budzyn*, 456 Mich at 89. The evidence of defendant's guilt was overwhelming.

## IV. SENTENCING

Defendant argues that his sentences for life without parole must be reversed because the trial court's findings and reasons for those sentences did not reflect that he was incapable of rehabilitation. Our review of a trial court's decision to sentence a juvenile offender to life without parole is threefold: (1) any fact-finding by the trial court is reviewed for clear error; (2) any questions of law are reviewed de novo; and (3) the trial court's ultimate determination as to the sentence imposed is reviewed for an abuse of discretion. *People v Hyatt*, 316 Mich App 368, ___; ___ NW2d ___ (2016) (Docket No. 325741); slip op at 25.

The United States Constitution forbids cruel and unusual punishment. US Const, Am VIII. In *Miller v Alabama*, 567 US 460; 132 S Ct 2455, 2460, 2469; 183 L Ed 2d 407 (2012), the United States Supreme Court held that the Eighth Amendment forbids a sentencing scheme that mandates life-without-parole sentences for juvenile offenders. *Id.* at ___; 132 S Ct at 2460, 2469. According to the United States Supreme Court, "[b]y making youth (and all that it accompanies it) irrelevant to imposition of that harshest sentence, such a scheme poses too great a risk of disproportionate punishment." *Id.* at ___; 132 S Ct at 2469. While the United States Supreme Court did not address whether the Eighth Amendment requires a categorical bar on sentences of life without parole for juvenile offenders, it believed that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty [as] noted in *Roper* [*v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005),] and *Graham* [*v Florida*, 560 US 48; 130 S Ct 2011; 176 L Ed 2d 825 (2010),]

of distinguishing at this early age between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at ___; 132 S Ct at 2469. Although the United States Supreme Court did not foreclose a trial court's ability to sentence a juvenile offender to life without parole, it now required trial courts to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at ___; 132 S Ct at 2469.

The United States Supreme Court clarified what a trial court misses if every juvenile offender is treated as an adult:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. . . . And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it. [*Id.* at ___; 132 S Ct at 2468.][2]

In *Montgomery v Louisiana*, ___ US ___, ___; 136 S Ct 718, 734; 193 L Ed 2d 599 (2016), the United States Supreme Court held that *Miller* applied retroactively to juvenile offenders whose convictions and sentences were final when *Miller* was decided, and reiterated that a life-without-parole sentence is cruel and unusual punishment for all juvenile offenders, except for the "rarest of juvenile offenders" whose crimes reflect irreparable corruption.

Following *Miller*, the Legislature enacted MCL 769.25. *Hyatt*, 316 Mich App at ___; slip op at 5. MCL 769.25 provides in pertinent part:

> (5) If the prosecuting attorney files a motion under subsection (2) requesting that the individual be sentenced to imprisonment for life without parole eligibility, the individual shall file a response to the prosecution's motion within 14 days after receiving notice of the motion.

> (6) If the prosecuting attorney files a motion under subsection (2), the court shall conduct a hearing on the motion as part of the sentencing process. At the hearing, the trial court shall consider the factors listed in <u>Miller</u> v <u>Alabama</u>, 576 US ___; 183 L Ed 2d 407; 132 S Ct 2455 (2012), and may consider any other criteria relevant to its decision, including the individual's record while incarcerated.

---

[2] These factors have been known as the "*Miller* factors." *Hyatt*, 316 Mich App at ___; slip p at 4 n 2.

(7) At the hearing under subsection (6), the court shall specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed. The court may consider evidence presented at trial together with any evidence presented at the sentencing hearing.

\* \* \*

(9) If the court decides not to sentence the individual to imprisonment for life without parole eligibility, the court shall sentence the individual to a term of imprisonment for which the maximum term shall be not less than 60 years and the minimum term shall be not less than 25 years or more than 40 years.

In *Hyatt*, 316 Mich App at ___; slip op at 1-2, this Court emphasized that the mandate of *Miller*, that a sentence of life without parole is reserved only for the rarest of juvenile offenders, affects not only the way a trial court is to exercise its discretion in sentencing a juvenile offender, but also the way an appellate court reviews a life-without-parole sentence. *Id.* In sentencing a juvenile, a trial court must begin its analysis with the understanding that life-without-parole sentences are, "unequivocally, only appropriate in rare cases." *Id.* at ___; slip op at 23. This Court further stated:

We note that nearly every situation in which a sentencing court is asked to weigh in on the appropriateness of a life-without-parole sentence will involve heinous and oftentimes abhorrent details. After all, the sentence can only be imposed for the worst homicide offenses. However, the fact that a vile offense occurred is not enough, by itself, to warrant imposition of a life-without[-]parole sentence. The court must undertake a searching inquiry into the particular juvenile, as well as the particular offense, and make the admittedly difficult decision of determining whether this is the truly rare juvenile for whom life without parole is constitutionally proportionate as compared to the more common and constitutionally protected juvenile whose conduct was due to transient immaturity for the reasons addressed by our United States Supreme Court. And in making this determination in a way that implements the stern rebuke of *Miller* and *Montgomery,* the sentencing court must operate under the notion that more likely than not, life-without-parole is not proportionate. [*Id.* at ___; slip op at 24.]

This Court stated that an appellate court's review of a life-without-parole sentence requires "a heightened degree of scrutiny." *Id.* at ___; slip op at 26. Although a trial court's decision to impose a life-without-parole sentence is reviewed for an abuse of discretion, an appellate court must view such a sentence as inherently suspect. *Id.* at ___; slip op at 26-27.

At the sentencing hearing, the trial court was aware of *Miller*. It knew that *Miller* prohibited mandatory sentences of life without parole for juvenile offenders and that, in sentencing defendant, it had to consider the *Miller* factors, but the trial court also stated that it had to consider the goals of sentencing: rehabilitation, punishment, deterrence, protection, and retribution. The trial court committed an error of law in considering these goals.

In *Miller*, 567 US at ___; 132 S Ct at 2464, the United States Supreme Court stated, "the distinctive attributes of youth diminish the penological justifications [which it identified as retribution, deterrence, incapacitation, and rehabilitation] for imposing the harshest sentences on juvenile offenders." This statement was repeated in *Montgomery*, where the United States Supreme Court also stated that *Miller* "established that the penological justifications for life without parole *collapse* in light of the distinctive attributes of youth." *Montgomery*, ___ US at ___; 136 S Ct at 733-734 (emphasis added). There can be no doubt that the trial court's consideration of the goals of sentencing impacted its decision to sentence defendant to life without parole. The trial court stated that it had to be satisfied that whatever sentence it imposed maximized the goals of sentencing. It further stated that it needed to address the attitude of defendant's peers that they could "engage in the law of the jungle." Then, when it sentenced defendant to life without parole, the trial court specifically stated that the sentence served to protect the public and to deter other individuals who might engage in similar conduct. The trial court's consideration of the goals of sentencing contravened *Miller* and *Montgomery*, which established that the goals of sentencing do not justify the imposition of a life-without-parole sentence for a juvenile offender.

Additionally, we cannot say that the trial court began it analysis regarding whether to sentence defendant to life without parole with the understanding that a life-without-parole sentence is only appropriate in rare cases and that such a sentence is more likely than not a disproportionate sentence. *Hyatt*, 316 Mich App at ___; slip op at 23-24. Although the trial court knew that *Miller* prohibited mandatory life-without-parole sentences for juvenile offenders and that it was to consider the *Miller* factors, the trial court never acknowledged the circumstance in which the United States Supreme Court allowed for such a sentence to be imposed. And nothing said by the trial court indicated that it understood the rarity with which such sentences should be imposed and that such sentences were reserved for the rarest of juvenile offenders whose crimes reflect irreparable corruption. In fact, at one point, the trial court stated that none of the *Miller* factors were applicable to this case. The statement implies a belief that a life-without-parole sentence can or should be imposed unless there is a mitigating factor not to impose the sentence. Additionally, the trial court's discussion about gang warfare and the need to address the attitude of people involved in gang warfare reflects a misunderstanding about the rarity of life-without-parole sentences. The discussion was not relevant to whether defendant was and would remain wholly incapable of rehabilitation for the remainder of his life. *Hyatt*, 316 Mich App at ___; slip op at 29. The court was focused on the punitive and deterrent aspects of sentencing.

In *Hyatt*, 316 Mich App at ___; slip op at 23-24, this Court emphasized the United States Supreme Court's statement in *Roper*, 543 US at 573, that even expert psychologists have a difficult time differentiating between juvenile offenders whose crimes reflect irreparable corruption and those whose crimes reflect transient immaturity. At the sentencing hearing, Larry Howley, who held a master's degree in social work, counseled children and adults since 1969, and who had counseled defendant for about two years beginning in 2011, testified that he believed defendant had the potential to be rehabilitated. Based on a visit with defendant at the juvenile detention facility, Howley even believed that defendant's rehabilitation had already started. Howley testified that he believed defendant could thrive and learn in a more structured environment. The trial court gave little credence to Howley's testimony, stating that it was not convinced that there was sufficient information to give it a high level of confidence that

-9-

defendant could internalize his acclimation to a structured environment to allow him to function in a nonstructured world. But yet, the trial court gave no explanation for this statement. In its analysis, the trial court never explained why defendant should be considered one of the rare juvenile offenders whose crimes reflect irreparable corruption.

Because the trial court made an error of law in considering the goals of sentencing a youth when it sentenced defendant to life without parole, and because the trial court did not sentence defendant to life without parole with the understanding that such sentences are reserved for the rare juvenile offender whose crime reflects irreparable corruption, we reverse defendant's sentences for life without parole and remand for resentencing. On remand, the trial court must not only consider the *Miller* factors and place its findings on the record, but it must also decide whether defendant is the rare juvenile offender who is incapable of reform. *Hyatt*, 316 Mich App at ___; slip op at 28. The trial court must be mindful that *Miller* and *Montgomery* caution against the imposition of a life-without-parole sentence except in the rarest of cases and operate with the understanding that, more likely than not, a life-without-parole sentence is a disproportionate sentence for defendant.[3]

Affirmed in part, reversed in part, and remanded for resentencing. We retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Douglas B. Shapiro
/s/ Michael F. Gadola

---

[3] Because we remand for sentencing, we decline to address defendant's argument that a life-without-parole sentence violates the Michigan Constitution. See *People v Eliason*, 300 Mich App 293, 316; 833 NW2d 357 (2013) ("[B]ecause it is unknown what sentence on remand will be imposed upon defendant, and for what reasons, it is best to leave this issue [whether a sentence of life in prison with or without the possibility of parole violates the state constitution] to another day.").

# Court of Appeals, State of Michigan

## ORDER

People of MI v Victor Manuel Garay

Docket No.  329091

LC No.  LC No. 2014-000785-FJ

Cynthia Diane Stephens
Presiding Judge

Douglas B. Shapiro

Michael F. Gadola
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court.  We retain jurisdiction.

Proceedings on remand in this matter shall commence within 63 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded.  As stated in the accompanying opinion, we remand this case to the trial court for resentencing for it to not only consider the *Miller* factors and place its findings on the record, but to decide also whether defendant is the rare juvenile offender who is incapable of reform.  The proceedings on remand are limited to these issues.

The parties shall promptly file with this Court a copy of all papers filed on remand.  Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 42 days after completion of the proceedings.

/s/ Cynthia Diane Stephens

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

April 11, 2017
Date

Chief Clerk