*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JONATHAN DEWIG HICKERSON,

        Defendant-Appellant.

UNPUBLISHED
October 8, 2019

No. 322891
Oakland Circuit Court
LC No. 2013-244355-FC

ON REMAND

Before: STEPHENS, P.J., and SERVITTO and BECKERING, JJ.

PER CURIAM.

This matter returns to this Court on remand from our Supreme Court for consideration of whether the trial court abused its discretion in sentencing the then 17 year old defendant, Jonathan Dewig Hickerson, to life without the possibility of parole for his conviction of first-degree felony murder, MCL 750.316(1)(b). *People v Hickerson*, 503 Mich 912; 919 NW2d 787 (2018). We affirm the sentence.

## I. BACKGROUND

The defendant was tried with a codefendant, Donald Lee James II (James). The two were sentenced at the same hearing, which was held on July 16, 2014. This Court previously considered defendant's challenges to his convictions and sentences in *People v James II*, unpublished per curiam opinion of the Court of Appeals, issued January 21, 2016 (Docket Nos. 322890 and 322891). Defendant was tried jointly, but before a separate jury, with James for what was a botched home invasion. Defendant, who was roughly three weeks shy of his 18th birthday, initially proposed robbing a home to two other friends, James (then aged 16) and Anthony Herald (Herald) (then aged 17).

At their trial, Herald testified that defendant planned the robbery. Defendant believed the targeted home would have weapons, marijuana, and money inside. Defendant directed both

-1-

Herald and James as to how to execute the robbery and purchased the ski masks to be worn during the crime. Herald testified to the trio surveilling the home prior to the planned robbery. Herald indicated at that time that he did not want to participate in the crime. Defendant called him a "b****" and later dropped Herald off at his home. Herald testified that he tried to get the defendant and James to abandon the plan. However, the next morning James came to Herald's home and told him that he and defendant "f***ed up" and that defendant had been shot.

The surviving victims of the robbery testified at trial. Megan Contreras (Megan), who was pregnant, testified that she was asleep when she heard a loud noise and saw two men walking into her bedroom. One assailant turned on the light, and she saw both had on black masks. One assailant was holding a large gun. Megan and her husband, Adrian Contreras (Adrian), were told to raise their hands. Megan hid underneath a blanket and then felt someone jump on her stomach and legs. She heard a number of gunshots. After the shooting stopped, she came out from under the blanket and saw Adrian dead on the floor.

David Contreras (David) testified to being awoken by a loud thud. He walked out in the hallway and saw two men in masks. One man shot a rifle at him, but missed. David crawled into a nearby bathroom and heard 10 to 12 more shots. During a quiet moment, David went across the hall to a bedroom where his brother, Brian Contreras (Brian), was located. Brian gave David a pistol while Brian loaded a shotgun. David heard 8 or 10 more shots coming from the rear of the house. Brian jumped out a window and ran to the backyard. David saw an assailant with a rifle in the hallway. David ran into the assailant and knocked him out of the back door to the house and into the backyard. David heard a voice saying, "Don't shoot," followed by several gunshots, and then what sounded like a round fired from Brian's shotgun. David ran into the backyard and found the assailant, still armed with the rifle. The assailant attempted to fire at David, but the weapon only clicked. David pulled the rifle away from the assailant, punched him, and then saw the assailant's face. David identified defendant as this assailant at trial. David heard another gunshot and saw the second assailant jump over a fence and drive away in a silver car. Brian's testimony was consistent with that of his brother David including the identification of the defendant.

Responding police officers arrested defendant in the backyard of the home. They recovered an AR-15 assault rifle that was on the ground near defendant. A ski mask was recovered from a nearby alley. DNA testing of the mask found a single donor, which was identified as James. James was arrested on October 25, 2012. He was found hiding under a mattress in the basement of his aunt's home in Pontiac. Defendant was convicted by a jury of six counts with the following sentences: first-degree felony murder, MCL 750.316(1)(b), (life without parole); assault with intent to commit murder (AWIM), MCL 750.83, (23 to 50 years); first-degree home invasion, MCL 750.110a(2), (11 to 20 years); and three counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, (2 years each).

On April 22, 2014, the prosecutor filed a motion seeking a sentence of life without parole pursuant to MCL 769.25. Defendant responded by requesting a hearing to present all facts and evidence that would warrant a term-of-years sentence. On May 29, 2014, the trial court entered an order adjourning sentencing so that a psychological evaluation could be completed. The evaluating doctor was directed to address the relevant factors provided in *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012).

Dr. Gerald A. Shiener evaluated defendant and authored a report dated June 11, 2014. Dr. Shiener's report indicated that the defendant gave inconsistent reports regarding the actual crime, finally settling on a version that admitted that he brought the AR-15 rifle with him to the targeted house, and committed the robbery. The bulk of the report detailed the defendant's cacophonous history. Defendant's father, who was 50 years' old when defendant was born, was an alcoholic and his teenaged mother abused narcotics. Defendant's father was never around, and defendant was raised by his mother and grandmother. Defendant was placed in Children's Village at age 14 after he assaulted his stepfather, tried to steal a car, and ran from police. He had assaulted his mother prior to that incident. Defendant threatened to kill himself once in the past. He self-reported that he had used marijuana, ecstasy, Xanax, "Molly," and synthetic marijuana. He had been in psychiatric care since age 14. He received special education services in school and repeated kindergarten and third grade. He had issues in school, including bringing BB guns to school and fighting with other students. He lived in his grandmother's basement, which tended to flood. Defendant reported hallucinations and to having seen Satan. He described an abusive home environment where his grandfather would physically assault defendant's mother. The report then states, "he had a history of car theft 'stealing automobiles to sell to chop shops and selling marijuana. He was said to have a history of fire setting and physical abuse."

Dr. Shiener noted that defendant did not display any "gross disorder of thinking." He also did not appear to have any depression or sadness. His affect remained appropriate. In describing the crime, defendant was concerned with the confidentiality of the interview and how his statements could affect his appeal. Defendant described many incidents that exhibited what Dr. Shiener described as "uninhibited aggression." While reporting hallucinations in the past, defendant did not report presently experiencing any secondary psychotic symptoms. According to Dr. Shiener, defendant did "not show any signs of any cognitive disturbance." With regard to the *Miller* factors, Dr. Shiener explained that defendant's record and character demonstrated disregard for others. His age was nearly 18 at the time of the offenses. He clearly came from a dysfunctional family background. The circumstances of the offense were horrific. While defendant claimed that no one was supposed to get hurt, he came into the home armed and fired the gun when he was confronted. He also disparaged a peer when that individual elected not to participate. With regard to whether defendant could have been charged or convicted of a lesser offense, Dr. Shiener found no "redeeming factors in this area of consideration." With regard to defendant's potential for rehabilitation, Dr. Shiener found that defendant's history and pattern of antisocial behavior showed a "limited" potential for rehabilitation. Dr. Shiener opined that defendant was "not likely to ever gain the degree of self-control and the ability to inhibit impulses that would be necessary for him to live in society without demonstrating the kind of poor impulse control and tendency to impulsive action that leads to the harm of others." Dr. Shiener additionally noted that defendant's seizure disorder "would also be limiting on [his] rehabilitation potential."

On July 15, 2014, the prosecutor filed a sentencing memorandum explaining why the prosecutor believed a life-without-parole sentence was appropriate. Sentencing for both defendants was conducted on July 16, 2014. James, then aged 16, spoke at sentencing and apologized for his actions. The trial court sentenced James to a term-of-years sentence for his first-degree murder conviction. Defendant, on the other hand, was sentenced to life without parole. The trial court explained that defendant was the leader of the offense, the "star actor of

this nightmare." The court noted that defendant had a troubled childhood, several juvenile offenses, and dropped out of school after completing 10th grade. The court believed the crime was committed in a depraved manner. Defendant fired the bullets that killed Adrian. The court also read the portions of Dr. Shiener's report regarding whether defendant could have received a conviction to a lesser offense and his likelihood of rehabilitation, apparently adopting those findings. The trial court then sentenced defendant to life without the possibility of parole for murder.

On appeal, defendant raised two issues: (1) that trial counsel was ineffective for arguing to the jury that defendant was guilty of murder in the second degree and home invasion, and (2) that his life-without-parole sentence was an abuse of the trial court's sentencing discretion under *Miller*. This Court found that counsel was not ineffective given the weight of the evidence against the defendant but agreed that the court erred in the process used to arrive at the life-without-parole sentence. This Court relied on the opinion in *People v Skinner*, 312 Mich App 15; 877 NW2d 482 (2015), rev'd 502 Mich 89; 917 NW2d 292 (2018), in which this Court held that the Sixth Amendment required the question of whether a juvenile should be sentenced to life without parole must be decided by a jury rather than a judge.

The prosecutor appealed, and on May 31, 2017, our Supreme Court held the application in abeyance pending its decision in *Skinner* which was under review at that time. *People v Hickerson*, 895 NW2d 526 (Mich, 2017). On June 20, 2018, our Supreme Court decided *Skinner*, 502 Mich 89. Relevant to this matter, the Court reached two conclusions. First, the Court rejected the notion that a jury must decide whether a juvenile offender receives a sentence of life without parole; rather, it is the trial court's role to make that determination, and doing so does not violate the Sixth Amendment. *Id*. at 96-97. Second, the Court rejected this Court's decision in *People v Hyatt*, 316 Mich App 368; 891 NW2d 549 (2016), to the extent *Hyatt* imposed a heightened standard of review for such sentences, requiring the trial court to determine whether a juvenile was the rare, incorrigible juvenile discussed in *Miller*. *Skinner*, 502 Mich at 97. Rather, our Supreme Court determined that the proper mode of review on appeal is for an abuse of the trial court's discretion, applying the "traditional abuse-of-discretion standard of review[]" discussed in *People v Babcock*, 469 Mich 247, 267-270; 666 NW2d 231 (2003). *Skinner*, 502 Mich at 97, 127-138.

After releasing *Skinner*, our Supreme Court vacated that portion of this Court's opinion in the instant appeal concerning defendant's sentence and remanded the matter to this Court to "review the defendant's sentence for first-degree murder for an abuse of discretion." *Hickerson*, 919 NW2d at 787-788. The prosecutor filed a supplemental brief on remand.

## II. STANDARD OF REVIEW

As was explained in *Skinner*, 502 Mich at 127-132, this Court does not review de novo the trial court's decision to sentence a juvenile offender to life without parole. Rather, this Court must determine whether the trial court abused its discretion using the traditional abuse-of-discretion framework. *Id*. at 132-138. In *Skinner*, the Court quoted *Babcock* (which concerned departures from the sentencing guidelines) for its explanation of the standard:

[T]he trial court is optimally situated to understand a criminal case and to craft an appropriate sentence for one convicted in such a case . . . .

It is clear that the Legislature has imposed on the trial court the responsibility of making difficult decisions concerning criminal sentencing, largely on the basis of what has taken place in its direct observation. Review de novo is a form of review primarily reserved for questions of law, the determination of which is not hindered by the appellate court's distance and separation from the testimony and evidence produced at trial. The application of the statutory sentencing guidelines to the facts is

> not a generally recurring, purely legal matter, such as interpreting a set of legal words, say, those of an individual guideline, in order to determine their basic intent. Nor is that question readily resolved by reference to general legal principles and standards alone. Rather, the question at issue grows out of, and is bounded by, case-specific detailed factual circumstances. [*Buford v United States*, 532 US 59, 65; 121 S Ct 1276; 149 L Ed 2d 197 (2001).]

Because of the trial court's familiarity with the facts and its experience in sentencing, the trial court is better situated than the appellate court to determine whether a departure is warranted in a particular case. Accordingly, review de novo, in which a panel of appellate judges could substitute its own judgment for that of the trial court, is surely not the appropriate standard by which to review the determination that a substantial and compelling reason exists to justify a departure from the guidelines range. Instead, the appellate court must accord this determination some degree of deference.

. . . . At its core, an abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome. When the trial court selects one of these principled outcomes, the trial court has not abused its discretion and, thus, it is proper for the reviewing court to defer to the trial court's judgment. An abuse of discretion occurs, however, when the trial court chooses an outcome falling outside this principled range of outcomes . . . .

Accordingly, the Court of Appeals must determine, upon a review of the record, whether the trial court had a substantial and compelling reason to depart from the guidelines, recognizing that the trial court was in the better position to make such a determination and giving this determination appropriate deference. The deference that is due is an acknowledgment of the trial court's extensive knowledge of the facts and that court's direct familiarity with the circumstances of the offender. The Court of Appeals is to conduct the thorough review required by MCL 769.34(11), honoring the prohibition against departures not grounded in a substantial and compelling reason. MCL 769.34(3). In doing so, however, the Court must proceed with a caution grounded in the inherent limitations of the

appellate perspective. [*Skinner*, 502 Mich at 132-134, quoting *Babcock*, 469 Mich at 267-270.]

The same analytical framework applies in situations concerning whether a juvenile offender should receive a sentence of life without parole or a term-of-years sentence. *Skinner*, 502 Mich at 134. "The trial court remains in the best position to determine whether each particular defendant is deserving of life without parole." *Id*. at 137. Thus, "the decision to sentence a juvenile to life without parole is to be made by a judge," and "this decision is to be reviewed under the traditional abuse-of-discretion standard." *Id*.

## III. ANALYSIS

There are a number of factors that are to be considered by the trial court when deciding what sentence is appropriate for a juvenile convicted of first-degree murder:

(1) "his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) whether "he might have been charged [with] and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and (5) "the possibility of rehabilitation . . . ." *Miller*, 567 US at 477-478. [*Skinner*, 502 Mich at 114-115.]

When applied, many of these factors recommend a life sentence without parole for this defendant. It is important to note that defendant was only three weeks away from his 18th birthday when he chose to go forward with the robbery. Had the crime been committed a month later, defendant would have received a mandatory sentence of life without parole, and there would be no further discussion. Cf. MCL 750.316(1)(b); MCL 769.25 and MCL 769.25a. Logically, it seems unlikely that anything would have changed in the last month or so of defendant's childhood that would have significantly altered his thought process or decision-making with respect to whether to commit such a crime.

The circumstances of the crime mediate toward the sentence imposed by the trial court. The defendant was the organizer of the crime. He was clearly aware that the home was occupied and yet, even after one of his cohorts withdrew from the crime, defendant returned that very night to execute the robbery. Either he or his companion brutally assaulted a pregnant woman and shot her spouse as she lay under a blanket next to him. Once out of the home, defendant lay in the grass still attempting to shoot at house occupants exiting the home.

The defendant had been in contact with the juvenile justice system for years. He had been placed under court supervision and in programs aimed at addressing his behavior. Yet rather than stop following the path he was on, defendant's criminal activity escalated. He progressed from truancy, to assault, to stealing motor vehicles, and then finally, to committing an

-6-

armed robbery of a home known to be occupied and to contain weapons. In the process, defendant ignored the likely consequence—death of a human being, whether himself or anyone else that was inside the home—despite several opportunities to take a second look and abandon the plan. Even despite seeing one of his friends reach the conclusion that the plan was unwise, defendant not only moved forward, but berated his friend for refusing to continue. This set of facts could easily lead one to believe that defendant has little hope of rehabilitation, as the trial court and court-appointed psychologist concluded.

On the other hand, defendant was clearly raised in an environment that was detrimental to him. His mother was a young, drug-addicted parent who was largely absent from his life. His father was several decades senior to his mother, and was also absent for most of defendant's life. Defendant witnessed physical abuse, with his mother being physically abused by her own father. Defendant was raised largely by his grandmother. As the trial court noted, defendant had virtually no proper parentage. Defendant also had mental health problems, including a seizure disorder, and other diagnosed issues, although at the time of his psychological evaluation, the psychologist found little evidence that defendant's thought process was affected by any disorders. Defendant also had his own history of drug use, which could have played into his decision-making process at the time he decided to commit the crimes.

Defendant has argued that his blindness renders him less able to re-offend and infers that he is, therefore, more susceptible to rehabilitation. *Miller* and the statute allow consideration of his physical status when determining a sentence, MCL 769.25(6) (directing the trial court to consider the *Miller* factors and "any other criteria relevant to its decision . . . ."). Defendant's blindness resulted from injuries sustained during the commission of the crimes for which he was sentenced. We agree that defendant's blindness may make it more difficult for him to commit certain crimes in the future, but it does not necessarily alter his thought processes or proclivity for committing crimes. Nor does it lessen his culpability for the crimes he chose to commit.

In sum, this case presented what was likely a close call for the trial court. An analysis of the *Miller* factors does not clearly preponderate against or in favor of a life-without-parole sentence, nor does it clearly point toward one. Were this Court to engage in a de novo review of the record, perhaps it would reach a different result than the trial court did in this case but, this Court's role is not to engage in a de novo review. Rather, we must review the case for an abuse of discretion. *Skinner*, 502 Mich at 137. This standard necessarily recognizes that there is a range of possible correct outcomes. *Id*. at 133. The trial court was clearly appraised of the relevant facts, considered them, and reached an outcome falling within that range.

Affirmed

/s/ Cynthia Diane Stephens
/s/ Deborah A. Servitto
/s/ Jane M. Beckering